**AFFIRM; and Opinion Filed August 20, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00435-CR

**DELVECCHIO PATRICK, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F15-00259-V**

# MEMORANDUM OPINION

Before Justices Lang-Miers, Evans, and Schenck
Opinion by Justice Lang-Miers

Appellant Delvecchio Patrick[1] was convicted of murder and sentenced to 85 years' imprisonment and a $10,000 fine. In thirteen issues, appellant complains that the evidence was insufficient to support his conviction, and that the trial court erred in its rulings denying a continuance, overruling his motion for new trial, admitting and excluding evidence, overruling his objection to improper jury argument, limiting his cross-examination of witnesses, and admitting evidence of appellant's prior convictions.[2] We affirm.

---

[1] Appellant was also known, and referred to at trial and in several exhibits, as "Red."

[2] On July 13, 2015, this appeal was transferred to the Eighth District Court of Appeals in El Paso under a docket equalization order from the Texas Supreme Court. On April 17, 2018, the Supreme Court ordered the appeal transferred back to this Court.

**Background**

On August 19, 2012, Vickie Cook found her thirty-two year old daughter, Deanna, dead in the bathtub of Deanna's home.[3] The medical examiner who conducted the autopsy concluded that Deanna's death was caused by drowning and other homicidal violence.

Suspicion immediately focused on appellant with whom Deanna had been in a tumultuous, volatile, and often violent relationship since 2008. He was arrested on active warrants that same day in Balch Springs, Texas.

*Evidence of a Tumultuous Relationship*

The nature of Deanna and appellant's relationship was well known to family, friends, and the police. Several specific instances cataloging the tumultuous relationship between appellant and Deanna were admitted at trial.

*January 3, 2009: Appellant Arrested for Assaulting Deanna*

On January 3, 2009, Chamara Ingram was visiting with Deanna at her home in Balch Springs, Texas. Ingram testified that appellant "arrived in a rage . . . [h]e came in the house yelling, Why you ain't answering the phone? Why you not answering the phone?" Deanna was trying to keep appellant calm. Ingram left the room for a few minutes but when she returned she witnessed the following:

> Mr. Patrick was already on her. The door was already off the hinges, her door, so it wasn't never closed. (Deanna told her that appellant had kicked door off hinges in a prior rage when they were fighting) So I seen him had her by the neck up in the air choking her.
>
> So I screamed, Let her go. Let her go.
>
> He dropped her, let her go, and told me to shut up because he would do me the same way.

---

[3] Because both Deanna and Vickie Cook have the same surname they will each be referred to by their first name for clarity in this opinion.

Ingram went outside and called the police. She could hear appellant beating Deanna.

When responding Balch Springs Police Officer Joshua Smeltzer spoke to Deanna, she told him that appellant had grabbed her by the neck, choked her, and threatened her with a knife. The officer noted that there were finger marks on her neck and her voice was raspy. The officer gave Deanna a family violence package and she requested a protective order.

*March 20, 2010: Deanna Arrested for Assaulting Appellant*

Late on the night of March 20, 2010, Deanna ran to her neighbor, Shemica Alexander, dressed only in her bra and panties, screaming – "He's trying to get me, he's trying to get me, open the door, open the door" – and pounding on the door. When Alexander opened the door, Deanna said: "He's trying to kill me, he's trying to kill me." She was trembling and had bruises all over. Alexander believed that Deanna was running to her house in fear of appellant. Alexander described their relationship as "Fearsome, violent."

Alexander saw appellant in the yard when she opened the door. But he ran away when she let Deanna in.

Responding to a call from a motel employee at a La Quinta motel, Cedar Hill Police Officer Rhoden found appellant sitting in the lobby. Appellant told the officer that Deanna assaulted him and he left that location because he "had a warrant."[4] Appellant had a stab wound to the back of one of his shoulders, "some wounds" to his mouth and left forearm as well as a laceration to his tongue and scratches on face. The police later discovered a possible weapon that caused the puncture wound, a type of a tire tool ("tire ream") that resembles an ice pick, in Deanna's house, which was in a state of disarray.

---

[4] The warrant for arrest was for a prior assault appellant had committed on Deanna.

Although Deanna told the police that appellant assaulted her, the police arrested Deanna. There were no signs of any injuries that she was complaining of on that day. And appellant had puncture wounds on his back. It appeared to the police on that day that she had been the aggressor.

Appellant was taken to the hospital for his injuries; he was released and his wounds were deemed superficial. Deanna was arrested for assaulting appellant on this occasion; she was ultimately acquitted of this offense.

Rhoden testified that he was familiar with both appellant and Deanna and had several past interactions with them which were all major domestic disturbances where some type of physical altercation had occurred. As the officer testified: "there had been times that … she had called us over to her house and she had been beaten up pretty bad. And each time that we had been there … (appellant) … had left and was nowhere to be found." Even on the night Rhoden had arrested Deanna for assaulting appellant, the warrant about which appellant was concerned was for a prior incident with Deanna. Officer Rhoden advised Deanna "on several instances that she needed to try to get out of that relationship because it was pretty volatile."

*May 25, 2011: Appellant Arrested for Assaulting Deanna*

On May 25, 2011, about 10:30 a.m., Dallas Police Officer Troy Wayne Smith was dispatched to a family disturbance call on Frank Street. He came in contact with Deanna and appellant who were arguing back and forth. Deanna had injuries on her hands. Deanna told the officer that she got hit a couple times; when appellant produced a knife, she put her hands up and he slashed them. There were visible injuries to the face. The officer arrested appellant because he seemed more the aggressor.

*July 28, 2012: 911 call*

The State introduced evidence from a 911 operator in Dallas who received a call on July 28, 2012, from Deanna asking for the police to come and escort appellant away from her

–4–

neighborhood. Officers had been called for the same purpose several hours earlier that day. Deanna told the operator that appellant, who was sitting in a park across from her house, had been knocking on her door and telling her that she "better not go to work." Deanna did not want appellant to know that she called because "that triggers him" and he "tears my stuff up in my house." A recording of the call was played for the jury and a written transcription introduced for demonstrative purposes.

Responding Dallas Police Officer Brad Kallio and his partner found appellant in the park. Appellant, who had two bags of clothes with him, told the officers that he was waiting for his niece to come pick him up. It was late at night and the story did not make sense to the officers. They drove him to his step-father's house in Balch Springs. No arrest was made because the officers did not find that an offense had been committed at the time.

*Observations by Appellant's Stepfather*

Appellant's stepfather, Allen Dean Hall, testified that appellant and Deanna had a volatile relationship: "they would be lovey dovey for two days, and then they be arguing, fighting. You know, she call him cussing and, you know, just raising general hell on the phone." Deanna was not allowed at Hall's house because she was always threatening violence and did not like his family. At the end of one telephone message where she threatened the family, he heard three gunshots. On another occasion Deanna came to Hall's house with a machete and tried to call out his youngest son's girlfriend who had allegedly told appellant that Deanna was cheating on him. Hall told appellant many times to leave Deanna alone but "he loved her." Hall claimed that appellant would not call the police to report Deanna's violence because he did not want to hurt Deanna or her children. Appellant refused to attend a trial where Deanna was charged with assaulting him.

*Observations by Deanna's Mother*

Vickie was never comfortable with her daughter's relationship with appellant, which she described as "Rocky. Very rocky. Up and down. Sometimes good, sometimes bad." Appellant and Deanna had many altercations in which they would often injure each other physically. Vickie commonly saw Deanna with bruises, scrapes, and swelling; she advised her daughter to get out of this relationship. However, Deanna, who was very strong-willed, "wanted her relationship to work" and "believed in forgiving."

*Events Leading up to the Discovery of Deanna's Death*

Vickie saw her daughter on Sunday, August 12, 2012, at church. Appellant had accompanied Deanna to church, which was unusual. Vickie testified that their demeanors were also abnormal; Deanna was quiet and subdued while appellant was "all up in it." Vickie asked appellant what was going on; he replied "It's all right. Everything all right. We going to be good."

Vickie and Deanna spoke on the phone every day from that Sunday through Friday, August 17, 2012. That morning they were both on the "prayer line," a telephone prayer group set up by the pastor of Vickie's church. When they said goodbye to each other, it was to be the last time they spoke.

A text from Deanna's cell phone was sent at 9:34 a.m. The text read: "About to take a nap." There were no more texts sent from Deanna's phone number.

Vickie was unable to reach her daughter by phone all day Saturday, August 18, 2012. Nor was Deanna posting on Facebook, which was unusual because she "stay[ed] on Facebook all the time." Vickie made several telephone calls looking for Deanna, but was unsuccessful in finding her. Vickie decided she would go to Deanna's house after church on Sunday.

Vickie also spoke to appellant during this time. Appellant called Vickie on Saturday night and told her that he had last seen Deanna on Wednesday night, which would have been August 15,

2012. Appellant also told Vickie that he had sent "my homeboys" to Deanna's house; they told him that nobody had come to the door. Appellant again called Vickie early Sunday morning; this time he said that the last time he had seen Deanna was on Thursday, which would have been August 16. He again said that he had sent some friends to check on her, but, although the dog was barking, no one came to the door.

On August 16, 2012, the day before Deanna's death, she called 911. Deanna told the operator that she was on her way to work and was afraid that appellant, who was in the park across the street from her house, might break into her house when she left. She asked that officers go by and "check it out for me." Deanna explained that appellant, whom she called her "ex-husband," had been escorted from her house a few times. She also told the 911 operator that she had been unable to get a restraining order on appellant even though "he's tried to kill me three times."

On Sunday, August 19, 2012, when Deanna had not been seen at church, Vickie went to Deanna's house on Crimson Court. She was accompanied by her daughter Karletha and Deanna's two daughters. Two of Deanna's dogs were outside barking. The doors to the house were locked as was the back gate. One of Deanna's daughters jumped the back fence and let Vickie and the others into the yard. They noticed water coming out the garage door. Karletha kicked in the back door.

When they entered the house, there was an odor strong enough that Karletha ran from the house. Vickie noticed that water was everywhere in the house; it was so high it was over her feet. When she entered Deanna's bedroom, it was a "terrible mess," with "stuff" thrown "everywhere." Vickie testified that Deanna liked to clean and kept a tidy house.

As Vickie entered the bathroom, she saw "a shadow, a shadow behind the curtain." The shadow was Deanna's body in the bathtub. The water was still running. Vickie immediately suspected that appellant had killed Deanna; she shared these suspicions with the police.

*Evidence at Deanna's House*

Dallas firefighter and paramedic Carl Lumden was one of the first responders. Like Vickie, he noticed that the house was a mess; all carpet and flooring in the house was soaked with water, which was running out of the house and down the street.

Lumden found Deanna's body in the bathtub of the bathroom; it was bloated and swollen with what he assumed to be water. As Lumden stated: "Most bodies don't look like that unless they've been drowned." He felt for a pulse. Because Deanna was beyond medical help and CPR was not possible, Lumden and his crew preserved the scene until police arrived. The faucet in the bathtub was still running; Lumden turned it off.

Responding Dallas Police Officer Samuel Bryant also noticed that water was running out of the house and down the driveway. Once inside the house, Bryant noticed that there was standing water in the living room. While securing the house, he found that the door to the bedroom looked like it had been forced; the frame was cracked and broken and the lock was sticking out of the side of the door.

Inside the bedroom, it appeared to Bryant that there had been a disturbance. He noticed that the bed had been pushed off the rails and things had been knocked off the walls and the dresser. Everything else in the house appeared normal except in the bathroom, where he found Deanna's body face down in the bathtub with her feet hanging out. The bathtub was completely full of water and there was standing water in the bathroom. In Bryant's opinion, water was a deadly weapon capable of causing serious bodily injury.

Responding Dallas Police Officer Michael Mulkey described the condition of Deanna's house as follows:

> There was water all throughout the house. The back door had been forced open. The bedroom door had been forced open as well.

The bedroom was in the appearance that there may have been a struggle. You know, things that were out of place that wouldn't have naturally been out of place, lamps knocked down, bed flipped over. Water throughout the bedroom, throughout the bathroom. And the deceased was in the bathtub.

It appeared to Mulkey as if a significant struggle had taken place in the bedroom. Mulkey testified that the door to the bedroom had been forced open and appeared to be freshly broken. The deadbolt had been secured from the inside, which the officer thought was odd. The position of the dead bolt was not consistent with the damage the officer saw to the door and he thought it was possible that somebody had turned the dead bolt after the door had been damaged.

***Appellant Seen on August 17, 2012, on Deanna's Street***

On August 17, 2012, appellant was living with his stepfather on Mohawk Drive in Balch Springs, Texas. In the hours leading up to Deanna's death, the landline at the Mohawk house called Deanna's cellphone 164 times.

Debbie Lawson, who was Deanna's mail carrier and who knew Deanna, told the police and members of the District Attorney's office, prior to trial, that around 10:40 a.m. that morning she saw Deanna walking down the street with appellant. Deanna had bags in her hands. They were walking intentionally towards Deanna's house. Appellant glared at her and Deanna did not speak, which was unusual. At trial, however, Lawson testified only that it "could have been" appellant because it had been so long. Lawson acknowledged that her recollection was better earlier, rather than at trial, and that she was apprehensive about testifying.

Dennis Williams, who lived on Crimson Court about five houses from Deanna, came home from his job for lunch about 11:30 a.m. He had previously seen appellant twice. As Williams drove down the street, he noticed appellant, wearing no shirt and no shoes, sitting on the trunk of a white car. Appellant was "just out there chillin." Williams blew his horn at appellant, but appellant did not respond. Williams was sure of his identification, even though appellant had grown his hair out since that day.

*The August 17, 2012, 911 Call and Police Response*

At 10:52 a.m., Deanna's cellphone called 911; the call lasted seventeen minutes and twenty-one seconds. Vickie identified two of the three the voices on the recording as Deanna and appellant. Dallas Police Detective Derick Chaney, who grew up with appellant and had known him for many years but had not seen him since high school, also recognized appellant's voice on the 911 recording.

On this recording, Deanna is begging a man she addresses as "Red," "Delvecchio," and "Baby," to "please stop." She asks, "Why are you doing this to me?" and says "Please Delvecchio. Please, I am not doing anything. Baby please!" Then the man identified as appellant says, "I'm gonna kill you," and "Get the fuck down."

Vickie testified that she could hear water running at one point on the on the tape and, at times, it sounded as though Deanna was pushed under water:

> Q. (BY THE PROSECUTOR) Is there a point in that call where it sounded that Deanna's voice was changed because she was pushed down into that water?
>
> *
>
> THE WITNESS: Yes. She was like gurgling. Sounded like muffled sounded, but it was still Deanna. It was Deanna's voice.
>
> Q. (BY (BY THE PROSECUTOR)) As though she was pushed underwater?
>
> A. Sounded like it.
>
> *
>
> Q. (BY (BY THE PROSECUTOR)) Now, Ms. Cook, you talked earlier about how your daughter was a fighter; is that right?
>
> A. Yes.
>
> Q. At the beginning of that tape, it sounded like she was fighting, wasn't she?
>
> A. She was struggling, yes. She was trying.

Q. And your daughter, at the end of that tape, was she fighting?

A. No. She was pleading.

Q. She's begging for her life, Ms. Cook?

A. Yes.

As Deanna's voice disappears from the recording, the call ends with the man identified as appellant repeating "I'll kill you. I'm gonna kill you. I'm gonna kill you." A dog is heard barking. The voice of the operator then says "Hello ma'am. Do you need police, fire, ambulance? Hello?"

Cell phone records reflected that the 911 operator attempted to call this phone back at 11:10 a.m. and 11:12 a.m., but the calls went to voice mail. Police were dispatched to the scene, arriving about 11:45 a.m., approximately an hour after the original call had been made. They rang the doorbell, but there was no response. They walked the perimeter of the residence, but could see no signs of a disturbance. They also tried to call the caller back, but the call went to voice mail. Under the circumstances, the officers did not believe there was justification to kick the door in because the report had been of a disturbance, not an offense.

### Deanna's Cell Phone

There was also testimony that the 911 call began and ended using cell tower 559. After the 911 call, Deanna's cellphone contacted three other towers. Her phone, however, was not found in her house.

### Forensic Evidence

*The Autopsy*

An autopsy was conducted on Deanna's body on August 20, 2012. There had been significant decomposition to her body. The only fluid that remained in her body from which a sample could be taken was in her chest cavity.

Analysis of this fluid established that it contained 0.20 milligrams per liter of phencyclidine, commonly known as PCP. This indicated that, at some point prior to her death, Deanna had used PCP, though it was not possible to say when that use had occurred. The medical examiner testified that this amount was scientifically inaccurate, for purposes of determining how much PCP was in Deanna's system and how it was affecting her at the time of her death, because a calculation could not be based on the fluid available for testing. The medical examiner was of the opinion, however, that PCP did not contribute to Deanna's death.

At the time of the autopsy Deanna also had an alcohol[5] level in her blood of 0.099 grams of alcohol per 100 millimeters. But, because what was being analyzed were decomposed samples, it was not possible to determine the exact concentration of alcohol, if any, at the time of her death. It was possible that this alcohol concentration was due to decomposition.

After conducting the autopsy and listening to the August 17, 2012, 911 call, the medical examiner concluded that Deanna's death was caused by "drowning and other homicidal violence." Death as a result of asphyxiation, which could occur as a result of drowning, strangulation or suffocation, was also consistent with the medical examiner's findings. Several other medical examiners reviewed the autopsy report, listened to the 911 recording, and agreed with those conclusions. Without the 911 recording, the medical examiner admitted this would have been only a "highly suspicious, mysterious death."

*Drug Evidence: PCP*

There was evidence at trial that Deanna was a lifelong user and abuser of PCP. Evidence was also introduced that PCP use can cause hallucinations, delusions, bizarre behavior, violent

---

[5] The medical examiner used the words "alcohol" and ethanol" interchangeably in her testimony. We will use the word "alcohol" in this opinion.

behavior, suicidal ideations, and even death in certain amounts. The jury also heard evidence that, as long as PCP is in a person's brain tissue, it is producing an effect.

*DNA Evidence*

A forensic biologist with SWIFS obtained a DNA profile from Deanna's autopsy kit which contained some anal swabs, some fingernail clippings, and autopsy blood. He compared the DNA standards taken from Deanna and a buccal swab standard from appellant. All samples matched Deanna's DNA. This biologist testified that he did not detect "any genetic markers that would indicate that there would be a male contributor."

However, subsequent Y-STR testing, which is a more sensitive method of evaluating DNA, could not exclude appellant as a contributor to the DNA recovered from Deanna's fingernails. The Y-STR profile from Deanna's fingernails would be expected in one out of every 2,294 African-American males;[6] 99.9% of all other males would be excluded based on the partial Y-STR profile that was found under Deanna's fingernails. A vaginal swab contained two male DNA profiles, but appellant was not a contributor.

***Psychological Evidence***

Prior to her death, Deanna had been diagnosed with a number of mental health issues: bipolar disorder, schizophrenia, schizoaffective disorder, unspecified psychosis, and a mood disorder diagnosis "not otherwise specified." Deanna had self-reported ADHD in childhood. She suffered from hallucinations and delusions. Deanna began using both marijuana and PCP at an early age and continued to do so throughout her life. There was testimony that these drugs can exacerbate mental illness. PCP, in particular, increases any type of mental illness, particularly hallucinations and delusions, because PCP "itself can create those symptoms in a person." The

---

[6] Appellant is an African-American male.

range of conditions that Deanna exhibited led to a host of behaviors, lifestyle choices, and erratic behaviors that were, at times, self-destructive.

*Jail Calls*

Appellant's voice was also identified on recorded calls he made while confined in the Dallas County jail. In one call, appellant explained how he acts when he "gets into it" with women:

> Nine times out of ten, if they say I done whoop they ass, nine times out of ten, you know what I had did to 'em, nine times outta ten, I'd have wrestled they ass down real hard . . . I get into it with a girl and I wrestle her ass down.

*Trial and Appeal*

The case proceeded to a jury trial in May, 2015. The jury found appellant guilty of murder and assessed punishment. Appellant filed a motion for new trial, which the trial court denied after an evidentiary hearing. This appeal followed.

### **Issues 1 and 2: Denial of Motions for Continuance and New Trial**

During trial, a potential witness came forward who was unknown either to the State or to the defense. The witness, Jamie Hardaway, is a nurse who worked in the Dallas County Jail when appellant was confined there. The trial court permitted the State to offer Hardaway's testimony during its rebuttal case, and denied appellant's motions for continuance and new trial. In his first and second issues, appellant complains of these rulings, arguing that he did not have sufficient time to investigate Hardaway's statement that she heard appellant confess to murder.

Testimony before the jury began on Monday, May 18, 2015. On Thursday, May 21, outside the jury's presence, the trial court discussed with counsel the sequence of events regarding Hardaway.[7] The State learned about Hardaway on Tuesday, May 19, and reported to the court and

---

[7] The trial court also made written findings of fact and conclusions of law relating to its denial of appellant's motion for new trial after this appeal was abated for that purpose. The State contends that although the findings and conclusions are favorable, the trial court lacked jurisdiction to enter them. In any event, the trial court's findings recite the same sequence of events as reflected in the reporter's record that we discuss here.

to the defense the possibility that the State would call Hardaway because "she might have overheard an admission by" appellant. On Wednesday, May 20, the State sent an email to the trial court and to defense counsel that disclosed Hardaway's name and the substance of her possible testimony. The defense stated its intention to object, and to move for a continuance or to strike Hardaway's testimony. Both parties then submitted case authority to the trial court in support of their arguments. The State did not call Hardaway during its case in chief, informing the court that "they decided to call her in rebuttal, if there was going to be any rebuttal," as the court explained.

Also on Wednesday (as stated on the record by the trial court on Thursday), the trial court indicated to counsel that "I was inclined to let her testify," and "I was also inclined to allow the Defense a motion for continuance." The court continued, "[t]hat was before we finished early" on Wednesday and the court instructed defense counsel "to start hustling and try to figure out what they could." The trial court signed an order to obtain jail records, and the State shared information "regarding criminal history." The parties also identified and located Clint Stoker, another potential witness who was present when appellant allegedly made the statement to Hardaway. Stoker denied that appellant made any admission to Hardaway, and was available to testify at trial. The trial court ruled as follows:

> THE COURT: It is important to me that this is rebuttal testimony and not going to be offered in the State's case in chief. It's also important to me that nobody says there was bad faith on the part of the State; that the witness came forward and neither side could have anticipated this. Nobody knew about it, it's my understanding, until she said it. So I don't think there was any way this could have been anticipated.

In the Thursday, May 21 discussions on the record, the court also stated that the defense had requested a continuance in order to find "another witness who might have witnessed the conversation" in question. The court deferred closing arguments until the following day, to allow the defense to "work hard and diligently to try to find this witness, if there is any, before tomorrow morning." Defense counsel responded:

–15–

[W]e were allowed to speak to [Hardaway] at noon today, [and] for the first time learned that she had a DSO officer in her presence who she said also overheard the conversation . . . I understand the Court's giving us the rest of the day, but if we don't find it tonight, we're going to renew the motion [for continuance] in the morning because we feel like we are entitled, given the evidence is crucial as a purported confession, that we're entitled to have a reasonable opportunity to investigate that case. And I understand that this came up late; nonetheless, I think that we're entitled to reasonable investigation, and I don't know that it can be completed by this evening.

After this exchange, the jury returned, the defense rested, and the State began its rebuttal case. Ann Robinson, a "classification coordinator" for the Dallas County Sheriff's office, testified that appellant and Stoker were in adjacent jail cells between April 5 and April 9, 2013. Robinson explained that Stoker had been arrested and booked for a capital murder offense shortly before April 5, 2013. Robinson confirmed that the placement of the cells was such that a nurse dispensing medicine could have a conversation with both persons at one time.

Hardaway then testified. She said that she had contacted the district attorney's office recently. She explained, "I used to work for the Dallas County jail for Parkland Hospital for several years. And I had an encounter there that really just stuck with me, bothered me, and I never forgot it." She testified that "within a couple of days" after Stoker's arrest for capital murder, she was passing out medication and asked Stoker, whom she knew, "what he was doing back in jail." She explained:

A. . . . He'd been there many times and I knew him and—you know, through dealing with him. And I just basically, you know, "What are you doing back here?" And he told me why he was there and said, "I didn't do it. I can't spend the rest of my life in jail, Ms. Jamie. I didn't do it. They say I murdered somebody and I didn't do it."

And then [appellant] said, "I did."

And Mr. Stoker kind of looked at him. And he said, "Shit. I killed that bitch. And every time I've been in jail before, I can do my"—basically Mr. Stoker said, "I can't serve my life in prison. I didn't do this."

[Appellant] said, "Every time I've been in jail before"—

–16–

Q. Let me clarify something with you. Did [appellant] say something about how this would affect him doing his time on this offense?

A. He said that he would be at peace because he no longer had to worry about her. And every time he had been in jail prior, he just sat and worried about what she was doing. And he no longer would have to do that.

On cross-examination, Hardaway admitted that she did not make any record of the exchange. Although she said she discussed it with co-workers, she could recall only one such co-worker, a Dr. Pavelka. She also testified that there was a Sheriff's officer with her, but she did not recall the officer's name, gender, or race, and would not have asked the officer to report appellant's statement because, in her experience, doing so would "ma[k]e my job very difficult." She testified that there would be a written record of the medications dispensed to inmates.

The State rested after Hardaway testified. The defense called Stoker, who denied talking to Hardaway or to any nurse about his case. He testified he never talked with anyone in the jail about his case. He denied "really knowing" appellant at all, and said, "No, sir, I didn't hear him admit he committed no murder at all. And why would he admit to me? I don't know him." He would remember "if somebody had admitted to you they committed a murder," and he did not remember "anything like that" by appellant. He explained that to even be heard in conversation in jail while medication was being dispensed, "you have to be talking pretty loud" because it is noisy. On cross-examination, Stoker said he had "no idea who Nurse Hardaway is."

After Stoker's testimony, the court was in recess from 3:12 p.m. until 10:30 a.m. the following morning, when the court stated:

The record should reflect that we're outside the presence of the jury. It's 10:52. The reason why we started late is because I wanted to give the Defense some opportunities to find certain evidence, subpoena things they needed to subpoena, or find witnesses that they needed to do. I gave them extra time this morning.

The parties then proceeded with objections to the charge and other matters outside the presence of the jury. At 12:07, the court stated:

–17–

The record should reflect it's 12:07. The record should reflect on Wednesday, we broke early. The Defense had an opportunity to gather information. We had testimony yesterday that was put on by the Defense to rebut the State's witness, Ms. Hardaway. We broke early yesterday [Thursday], and the Defense has been working feverishly since then to gather records, to obtain records from Parkland . . . Health and also from the Dallas County Jail. It is my understanding they have received documents that they intend, the Defense, on introducing at this point. They have also requested that—correct me if I'm wrong—you would like more time to find an additional witness, a live witness, who ostensibly would be the accompanying Sheriff's officer or the guard, who, according to one witness's testimony, would have heard [appellant] having this conversation with Mr. Stoker.

The court then confirmed that the defense had not been able to obtain the information it sought. The court ruled that "given the fact you were able to call Mr. Stoker, and also given the fact you received exhibits you intend on introducing now, I'm going to deny any further motion for continuance at this time."

When the jury returned, defense counsel introduced Defendant's Exhibit 4; the trial court admitted the exhibit into evidence and defense counsel published it to the jury, explaining that it was sixteen pages of records reflecting the times appellant received medications while in jail. Defense counsel explained that although Hardaway testified that appellant made his confession the week of April 4 through April 9, 2013, the records did not reflect any dispensation of medication to appellant between March 8 and June 4, 2013. The only contact between Hardaway and appellant appearing in the records was on May 7, 2013. The State gave its own explanation of the exhibit to the jury, stating that medications were prescribed for appellant during the week in question.

In his motion for new trial, appellant again complained of insufficient time to investigate Hardaway's claim. He argued that although his counsel worked diligently during the time allotted by the trial court, "it was not until the punishment phase of trial, on the following Tuesday, that the defense was able to identify the sheriff's deputy that worked on the floor of the jail where [appellant] was incarcerated at the time of the alleged confession." Appellant attached affidavits

of nine witnesses, all of whom stated one or more of the following facts: (1) they worked in the jail at the time appellant made the alleged confession; (2) nurses dispensing medication to inmates were always escorted; (3) escorts stood within one or two feet of a nurse dispensing medication to respond quickly to any problem that arose; (4) their normal practice was to document both the nurse's presence on the floor and the identity of the escort; and (5) they did not hear, or do not recall hearing, about a confession made by appellant or by any inmate. Appellant also attached approximately thirty pages of records from the week in question, showing the names and locations of staff who were on duty.

At the hearing on appellant's motion for new trial, the defense presented testimony from "each of the officers that would have been on duty" on the relevant dates "escorting the medicine cart and handing out medicine." None of the officers heard appellant make a confession. Appellant's counsel argued that "for that reason we feel that the testimony of Ms. Hardaway was false. And had we been able to present these witnesses we think we would have effectively impeached her and on that basis we're asking for a new trial." In addition, the defense was unable to obtain records showing who was on duty during the relevant time until a few days after the trial concluded.

The State argued (1) the court did give the defense an afternoon and a morning to investigate before Hardaway testified; (2) the defense interviewed Hardaway before she testified; (3) the defense identified and called Stoker, who "absolutely did refute the contention of Nurse Hardaway"; (4) the defense found and offered "jail records the Defense attorney stated completely contradicted that the defendant was even receiving medication on that day"; (5) the witnesses who testified in support of the motion for new trial were "far more vague and less persuasive that the evidence that the Defense was able to present at trial," testifying only that they did not recall escorting Hardaway or hearing any confession; (6) even if Hardaway was "completely and totally

discredited," there was sufficient evidence to support the jury's verdict of guilt; and (7) the defense failed to show prejudice. The trial court denied the motion for new trial.

Article 29.13 of the Texas Code of Criminal Procedure provides that the trial court may grant a continuance after trial has begun "when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had." TEX. CODE CRIM. PROC. ANN. art. 29.13 (West 2006). We review a trial court's ruling on a motion for continuance during trial for an abuse of discretion. *Barney v. State*, 698 S.W.2d 114, 126–27 (Tex. Crim. App. 1985); *Guerrero v. State*, 528 S.W.3d 796, 799–800 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). To establish an abuse of discretion, an appellant must show that the trial court erred in denying the motion for continuance and that the denial actually and specifically prejudiced appellant's defense. *See Barney*, 698 S.W.2d at 126–27; *Guerrero*, 528 S.W.3d at 800.

We also review a trial court's ruling denying a defendant's motion for new trial for abuse of discretion. *Ford v. State*, 129 S.W.3d 541, 547 (Tex. App.—Dallas 2003, pet. ref'd). We do not substitute our judgment for that of the trial court. *Id.* Instead, we determine whether the trial court's analysis was arbitrary or unreasonable. *Id.* A trial court has wide discretion in ruling on a motion for new trial that sets out a valid legal claim, but should not grant a new trial if the defendant's substantial rights were not affected. *State v. Herndon*, 215 S.W.3d 901, 908–09 (Tex. Crim. App. 2007).

Citing *Merritt v. State*, 982 S.W.2d 634 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd, untimely filed), appellant argues that he has "demonstrated an inability to present specific testimony" as the result of the trial court's denial of his motion for continuance, "which established harm that was prejudicial to his constitutional rights to the opportunity to fairly and effectively confront any witnesses produced against the defendant." In *Merritt*, an inmate wrote a letter to his

former jail cellmate Kevin Stephens that was intercepted by a sheriff's deputy and delivered to the prosecutor. *Id.* at 635. But because of the prosecutor's late trial preparation, the State "did not know appellant had confessed" to Stephens until the morning of trial. *Id.* at 636. Although the State had not listed Stephens as a witness, the trial court denied Merritt's motion for continuance and allowed the State to call Stephens to testify. *Id.* at 635–36. The court of appeals concluded the trial court's ruling was error. *Id.* at 636 ("We hold the trial court abused its discretion in allowing the witness to testify without first allowing appellant some time to prepare."). But the court ultimately concluded that the error was harmless, and affirmed Merritt's conviction. *See id.* at 637.

In contrast to *Merritt*, the trial court did allow appellant's counsel time to prepare for Hardaway's testimony. Also in contrast to *Merritt*, the State acted promptly in identifying Hardaway after learning of her identity and possible testimony. As discussed, appellant's counsel interviewed Hardaway before she testified. Appellant's counsel also identified Stoker and called him as a witness, and Stoker flatly contradicted Hardaway's testimony. Counsel also obtained documents that did not support Hardaway's recollection. These documents were admitted into evidence, and appellant's counsel argued their significance to the jury.

Although appellant's counsel was able to identify and call additional witnesses for the hearing on appellant's motion for new trial, none of those witnesses had a specific recollection to recount. They testified about what they would have done had they heard about an inmate's confession, but could not recall any such confession, could not recall whether they had actually accompanied Hardaway on her rounds on the day in question, and could not have contradicted her any more directly than did Stoker:

> Q. (BY DEFENSE COUNSEL) Okay. Now, do you recall an occasion where you were getting your medication that you heard [appellant] admit that he committed a murder?
>
> A. No, sir, I didn't hear him admit he committed no murder at all. And why would he admit to me? I don't know him.

Q. If somebody had admitted to you they committed a murder, would you remember it?

A. Yes, I would remember it.

Q. Okay. And you don't remember anything like that?

A. Not at all. Like I said, I don't even really know him.

We conclude the trial court did not abuse its discretion by denying appellant's motions for continuance and new trial. *See Guerrero*, 528 S.W.3d at 799–800; *Ford*, 129 S.W.3d at 547. The record reflects that appellant's counsel prepared for Hardaway's testimony and obtained evidence rebutting it even though Hardaway did not come forward until after trial had begun. It was within the trial court's discretion to deny appellant's motions once appellant had been given time to address Hardaway's assertions. Although Hardaway's testimony was an "unexpected occurrence since the trial began, which no reasonable diligence could have anticipated," appellant was not "so taken by surprise that a fair trial [could] not be held." TEX. CODE CRIM. PROC. ANN. art. 29.13 (West 2006). Appellant interviewed and cross-examined Hardaway, obtained documents rebutting her testimony, and identified and offered the testimony of the only other participant in the conversation in which appellant allegedly confessed. We conclude that appellant's defense was not unfairly prejudiced by the trial court's rulings, and his substantial rights were not affected. *See Herndon*, 215 S.W.3d at 908–09; *Barney*, 698 S.W.2d at 126–17; *Guerrero,* 528 S.W.3d at 800. Further, as we discuss below, even without Hardaway's testimony, the evidence was sufficient to support appellant's conviction. We decide appellant's first and second issues against him.

### Issue 3: Jury Argument

In his third issue, appellant contends the trial court erred in overruling his objection to the following portion of the State's closing argument in rebuttal:

(BY THE PROSECUTOR) Now, he talked about some studies and some things that shows that if people are on PCP and you combine that with stress, well that can cause people to die. I want you to keep in mind that if the stress was caused by the defendant, under our law, he's still guilty of murder.

(DEFENSE COUNSEL): Your Honor, that would be a theory that's not included in the charge.

THE COURT: Overruled. Members of the jury, you have all the law and the evidence before you in the jury charge. Go ahead.

Appellant contends that the State "presented a fact situation to the jury that was at variance from the manner and means of committing the offense alleged in the indictment and presented in the court's charge to the jury," and "was asking the jury to convict [a]ppellant on facts at variance from the indictment and jury charge." Appellant contends that the argument was "highly improper and prejudicial and not supported by the evidence adduced at trial." He argues that "State's counsel directly and or indirectly presented a cause of death outside of the record and the court tacitly approved the conduct by overruling the objection; thereby compounding the claimed error." Appellant concludes that "the only proper way to remedy this prejudicial error is to grant appellant a new trial."

The State responds that the prosecutor's argument addressed concurrent causation, which was included in the jury charge. In addition, the State contends the argument responded to appellant's argument, injected no additional facts into the trial, and, in any event, was harmless.

Proper jury argument generally falls within four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). "[E]rror exists when facts not supported by the record are interjected into the argument, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper." *Id.* Unless appellant's substantial rights were affected, we must disregard the error. *Id.* at 572. "To determine whether appellant's substantial rights were affected, we balance the severity of the misconduct (*i.e.*, the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct." *Id.* at 572–73. In evaluating the severity of the misconduct, we

must assess "'whether [the] jury argument is extreme or manifestly improper [by] look[ing] at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial.'" *Id.* at 573 (quoting *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)).

The indictment alleged in part that appellant committed "an act clearly dangerous to human life," by "causing asphyxiation with water, a deadly weapon, and an unknown object, a deadly weapon, the exact nature of which is unknown and unknowable to the grand jury." The jury charge included an instruction that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor was clearly sufficient." *See* TEX. PENAL CODE ANN. § 6.04 (West 2011) (concurrent causation).

During trial, appellant introduced evidence that Deanna could have died from a combination of PCP and stress. Defense expert Gary Wimbish, a forensic toxicologist, testified about the effects of PCP on the human body. He testified that PCP "is a hallucinogenic material that produces alterations of mental facilities which can result in death." He reviewed the autopsy report for Deanna and testified that at the time of her death, the amount of PCP in her system was above the minimum concentrations "associated with fatality"; he agreed with defense counsel that "there are documented cases of people dying from PCP-related fatalities with the concentration that was found there." Further, Wimbish testified that a person's stress level affected the action of PCP on the body. He explained:

> In a number of cases in which there has been an interaction of these two parties where a great deal of stress, violence, disruption, not a happy time, people's adrenaline is flowing increasing heart rate, blood pressure, as you've all experienced, and then we compound that feeling with a feeling of euphoria and increased effect upon their heart of the norepinephrine that's being released. And then the last receptor, which is the most dangerous, is the one that produces the hallucinations, disorientation, which compounds all of that and has resulted in death from the combination of all of those . . . when stress is involved.

–24–

Wimbish also agreed with defense counsel that "there are documented cases of people dying from PCP while under stressful situations."

Citing this testimony, appellant's counsel argued in closing that the combination of stress and PCP was a concurrent cause sufficient to cause Deanna's death, regardless of appellant's conduct:

> Unexplained death. We have here a deadly trilogy; a perfect storm of mental illness, delusions, hallucinations, combined with stress, combined with alcohol, and combined with PCP abuse. Dr. Wimbish let us know that the literature has told us that with the levels that he saw on the autopsy in Deanna's body over and over and over again were examples of sudden, unexplained death.

> Now, the ultimate question, a person is criminally responsible if the result would not have occurred, and you'll read the rest later because we're running out of time. My question to you is, what person? . . . And then unless the concurrent cause was sufficiently—clearly sufficient to produce the result. We know it was because of the toxicologist. He told us that PCP abuse and stress in this case . . . were clearly sufficient to produce a death. . . .

The State's rebuttal argument that jurors should "keep in mind that if the stress was caused by the defendant, under our law, he's still guilty of murder" was in answer to the defense argument that "PCP abuse and stress in this case . . . were clearly sufficient to produce a death." After appellant's objection, the State did not develop the argument further, and the trial court instructed the jury that it must follow the instructions in the jury charge. The State brought no new facts into the case; there was evidence in the record from which the jury could find that appellant caused stress to Deanna when, as alleged in the indictment, he committed an act clearly dangerous to human life by causing her asphyxiation with water or with an unknown object, causing her death. And the trial court's instruction in the charge limited the jury's consideration to appellant's "conduct as charged in the indictment, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient" in determining whether appellant was criminally responsible. *See* TEX. PENAL CODE ANN. § 6.04(a) (West 2011)(concurrent cause). We conclude that the

–25–

argument was grounded in the record, responsive to appellant's argument, and relevant to the charge. *Cf. Brown*, 270 S.W.3d at 570–72 (proper argument does not include comment on opposing counsel's cross-examination tactics or veracity).

We also conclude that appellant's substantial rights were not affected even if the argument was improper. *See id.* at 572–73 (improper argument did not affect appellant's substantial rights, viewing record as a whole). The State immediately terminated the argument even though the court overruled appellant's objection, the court instructed the jury that "you have all the law and the evidence before you in the jury charge," and the charge contained an instruction on concurrent causation. Appellant does not complain of any other portion of the State's argument. The record as a whole does not demonstrate a willful or calculated effort on the part of the State to deprive appellant of a fair and impartial trial. *Id.* at 573. We decide appellant's third issue against him.

### Issue 4: Psychological Autopsy

In his fourth issue, appellant claims that the trial court erred by not allowing the defense to present a portion of a psychological autopsy[8] conducted by a forensic and clinical psychologist on Deanna after her death. The State responds that appellant sought to offer prejudicial facts through an expert witness as proof of the facts themselves, not in support of the expert's opinion.

*Hearing Held Outside the Presence of the Jury*

The trial court conducted a hearing outside the presence of the jury on the admissibility of a psychological autopsy conducted by Dr. Kristi Compton, a forensic and clinical psychologist.[9]

Dr. Compton reviewed all available material on Deanna including multiple hospital records, jail records, police reports, CPS and other related service reports, social media including

---

[8] Dr. Compton described a psychological autopsy as a means of trying to determine a deceased person's mental state while they were alive.

[9] The State did not challenge the qualifications of Dr. Compton as an expert. The State requested the hearing to determine exactly what her opinions were going to be at trial.

YouTube, the autopsy report, and the 911 call. Dr. Compton stated that Deanna "had been diagnosed with a plethora of disorders, including bipolar disorder, schizophrenia, schizoaffective disorder, mood disorder not otherwise specified, PCP abuse, cannabis abuse" as well as hallucinations and delusions. Dr. Compton also reviewed evidence of Deanna's drug use, particularly PCP and marijuana. Dr. Compton testified that drug use would increase any signs or symptoms of mental illness, particularly hallucinations and delusions.

Dr. Compton testified that there were several specific incidents between Deanna and her first husband, with her mother and her sister, and with CPS. She stated that, because of Deanna's life-long drug abuse and mental illness, Deanna responded to situations in violent ways. Deanna had reported hearing voices, hearing the devil talking to her, and believing that her mother was the devil.

Dr. Compton detailed an incident, from 2010, documented in one set of hospital records: "She was found unresponsive, taken to the hospital. She was hallucinating. Said she woke up speaking in a foreign tongue. She was hallucinating, drooling, inconsolable. And that's when she was diagnosed with an altered mental status. But also PCP and THC was detected in her blood work."

Dr. Compton also stated that Deanna's records reflected that, in 2012, she had passed out at a CPS office, urinated on herself, and attempted to remove her clothing. Deanna's records included suicide attempts, which Dr. Compton testified are a sign and symptom of mental illness; two of these attempts were documented although Deanna had self-reported five attempts. From a YouTube video that Dr. Compton had reviewed on social media, there were signs and symptoms of hypersexuality, which indicated mania. Dr. Compton agreed with defense counsel that all of these issues could be relevant to Deanna's state of mind at the time she made the 911 call.

At the conclusion of this hearing, the trial court ruled that Dr. Compton would be allowed to testify that Deanna had been diagnosed with multiple mental disorders, including "bipolar, schizophrenia, schizoaffective disorder, mood disorder, PCP and cannabis dependence . . . [a]nd . . . [a] mood disorder not otherwise specified." The trial court limited its ruling "to the extent that it bears on what Dr. Compton heard on the 911 tape." The trial court excluded any mention of specifics of anything having to do with the following:

> [I]ncidents with the first husband or CPS workers or incident[s] with her mom or her sister or incidents … where she had an episode that, according to doctor, resembled what she heard on the 911 tape or the incident report, what happened with the CPS office, which didn't have anything to do with what is heard on 911 tape.

> No mention of suicide and nothing specific about anything on YouTube.

The trial court stated that it found evidence of these incidents inadmissible and "totally prejudicial." The trial court also found that these specific incidents would not assist the jury in determining the ultimate issue in the case. The trial court based its ruling on rule 705(b). TEX. R. EVID. 705(b).

Defense counsel then stated: "The fact that she went into essentially an unconscious state on a previous occasion due to PCP abuse, I think, would be highly probative of the defense in this case, and we think it would be error to exclude that specific evidence. And we would ask the Court to reconsider that."

The trial court ascertained that Dr. Compton had reviewed an incident in records from Methodist Hospital where Deanna had an episode where she was unconscious, took her clothes off, and was speaking in "tongues" or a "foreign language." The trial court found that this had no bearing on what Dr. Compton heard on the 911 tape regarding the murder. The trial court again ruled this evidence inadmissible under rule 705(b).

Because the State had no objection to the part of that incident where Deanna was unconscious as a result of ingesting PCP, the trial court agreed to allow evidence of that as long as there was no mention of her drooling or "speaking in tongues." In cautioning the prosecutor and defense counsel, the trial court stated: "So the headlines are admissible but the specifics of the story are not."

### Testimony before the Jury

Dr. Compton testified before the jury that Deanna had been diagnosed with a number of mental health issues: bipolar disorder, schizophrenia, schizoaffective disorder, unspecified psychosis, and a mood disorder "not otherwise specified." Deanna had self-reported ADHD in childhood. She suffered from hallucinations and delusions. Because the diagnoses of schizophrenia, schizoaffective disorder and bipolar disorder are chronic disorders, there was a "reasonable degree of scientific certainty" that Deanna was suffering from those illnesses at the time of her death.

Dr. Compton also testified that Deanna began using both marijuana and PCP at an early age and continued to do so throughout her life. Dr. Compton stated that these drugs can exacerbate mental illness. PCP, in particular, increases any type of mental illness, particularly hallucinations and delusions, because PCP "itself can create those symptoms in a person." According to Dr. Compton, the range of conditions that Deanna exhibited led to a host of behaviors, lifestyle choices, and sometimes erratic behaviors that were, at times, self-destructive. Dr. Compton expressed her opinion that if a person was experiencing a delusion or a hallucination that they were under attack by someone, their body would react just the same as if they were under an actual attack because their perception is their reality. She was also permitted to offer an opinion of what might, theoretically, have been happening based on sounds of water that she heard, or did not hear, on the 911 call:

(BY DEFENSE COUNSEL) Did you hear any water splashing on the 911 tape?

A. I could not detect any water splashing, but I think what I detected was a faucet and water running.

Q. If a person were actually experiencing a drowning by water, would you not expect to hear water splashing?

A. I would expect to.

Q. If a person was actually experiencing a physical attack, would you not expect some type of physical injuries to their body?

A. I would expect to see that.

Q. Would the absence of water, the sound of water splashing, and the absence of any physical injuries whatsoever, tend to lend itself towards an actual struggle or a hallucination?

A. I think I understand – I think I understand your question. If there's no physical evidence of a struggle and there's nothing to back up that there's a struggle, then it could be indicative of a hallucination.

On cross-examination, Dr. Compton testified that she had also reviewed the police report and the 911 recording. She heard nothing on the 911 call that would indicate that Deanna was experiencing a delusion or a hallucination. This is particularly true with the male voice on the 911 call: "There's a male voice on that 911 call and I don't believe that's a hallucination or projection of a voice." In Dr. Compton's view, Deanna sounded scared and terrified, but she was lucid as she was articulating, not slurring, and was not talking in a way that was not coherent. Dr. Compton expressed no opinion on who killed Deanna, or whether her death was a suicide or a murder.

Dr. Compton was not questioned on the specific incident of unconsciousness which the parties had agreed to admit at the hearing.

### *The Trial Court Did Not Err by Limiting Dr. Compton's Testimony*

Appellant's complaints to the exclusion of this evidence at trial were on the basis of relevance.[10] As defense counsel stated: "I'm sure the Court understands our presentation about PCP. The fact that she went into essentially an unconscious state on a previous occasion due to PCP abuse … would be highly probative of the defense in this case, and … it would be error to exclude that specific evidence." Appellant argues in his brief that Dr. Compton's excluded evidence "would have helped the jury understand and fully appreciate Dr. Compton's expert opinion and to understand the basis of the opinion."

*Standard of Review*

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002). We uphold a trial court's ruling if it is within the zone of reasonable disagreement. *Id*.

*Admissibility of Expert Testimony*

The admissibility of expert testimony is governed by the rule 702 of the Texas Rule of Evidence. TEX. R. EVID. 702. Under rule 702, the proponent of scientific evidence must show by clear and convincing proof that the evidence he is proffering is not only relevant, but also reliable in assisting the jury in accurately determining a fact issue or understanding other evidence. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). It is a trial court's responsibility as the "gatekeeper" under rule 702 to determine whether proffered scientific evidence is

---

[10] In his brief, appellant also complains that the trial court erred by excluding portions of Dr. Compton's opinions because 1) she should have been allowed to rely on hearsay for her opinions and 2) he was denied due process under the Fourteenth Amendment to the U.S. Constitution by the trial court's ruling. U.S. CONST. amend XIV. Appellant does not cite this Court to any place in the record where he voiced these objections or otherwise presented these claims to the trial court. Additionally, our review of the record does not reveal where appellant voiced these objections or otherwise presented these claims to the trial court. Consequently, these issues are neither preserved nor adequately presented for our review. *See* TEX. R. APP. P. 33.1(a)(1), (2); TEX. R. APP. P. 38.1(i); *Buntion v. State*, 482 S.W.3d 58, 106 (Tex. Crim. App. 2016); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015).

sufficiently reliable and relevant to assist the jury. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000); *see also* TEX. R. EVID. 104(a). Before admitting expert testimony, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *Jackson*, 17 S.W.3d at 670. These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela*, 209 S.W.3d at 131. Before admitting expert testimony, the trial court must determine that all three conditions are met. *Id*

Because the State did not dispute Dr. Compton's qualifications as an expert, the first prong of the test is satisfied. The State did not question the second prong, *i.e.*, that the subject matter of her testimony was appropriate for an expert opinion. The only remaining question is relevance.

*Lack of Relevance*

The trial court's exclusion of evidence of specific incidents between Deanna and her mother, her sister, her ex-husband or CPS employees was not an abuse of discretion. Evidence that Deanna may have acted violently or irrationally in interactions with persons other than appellant is not relevant to whether appellant drowned Deanna, or that Deanna may have attempted suicide in the past.

The trial court permitted Dr. Compton to testify extensively about Deanna's mental illnesses and drug abuse. Dr. Compton was also allowed to discuss the potential for a hallucination based on what she heard on the 911 recording, and Dr. Compton was permitted to testify that she did not hear anything on the 911 recording that suggested Deanna was hallucinating or delusional.

When asked if Deanna sounded lucid, Dr. Compton replied: "Yes. She was articulating. She was not slurring. She wasn't . . . talking in a way that was not coherent."

Dr. Compton did not express an opinion on the ultimate issue for the psychological autopsy, *i.e.*, whether Deanna's death a homicide, a suicide, natural, accidental, or undermined. She did not offer an opinion on who killed Deanna. We conclude that the trial court did not abuse its discretion.

### Any Error is Harmless

The exclusion of expert testimony is non-constitutional error that is reversible only when it affects an appellant's substantial rights to a fair trial. TEX. R. APP. P. 44.2(b); *Coble v. State,* 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble,* 330 S.W.3d at 280. In determining the effect of the exclusion of evidence, we review the entire record and calculate the probable impact of the error upon the rest of the evidence. *Id.*

Even if the trial court erred by limiting Dr. Compton's testimony, that error did not affect appellant's substantial rights and was harmless. Dr. Compton was allowed to testify that Deanna suffered from multiple mental illnesses and that she had used PCP and marijuana from an early age throughout most of her life. Dr. Compton was also allowed to testify as to the results of PCP use by a mentally ill person: "PCP increases any type of mental illness that is present to begin with. It can increase hallucinations. It can increase delusions because PCP in itself can create those symptoms in a person."

The defense was also allowed to introduce the testimony of Dr. Wimbish, who expressed the opinion that PCP was a contributing factor in Deanna's death. Dr. Wimbish testified in detail about the effects PCP has on a person: hallucinations, disorientation, confusion, manic behavior, violent or bizarre behavior. Wimbish was also allowed to testify that a person can die from an

overdose of PCP in amounts much smaller than those measured in Deanna's body. Wimbish stated that there was also an interaction between PCP and stress and that there are documented cases of people dying from ingesting PCP under stress.

The jury had ample evidence from which it could evaluate Deanna's PCP use and the effect it had on her death, if any. We conclude that any error in limiting Dr. Compton's testimony was harmless. We overrule appellant's fourth issue.

### Issue 5: Limitations on Cross-Examination of Vickie Cook

In his fifth issue, appellant claims that the trial court erred by denying him the right to cross-examine Vickie, Deanna's mother, about specific incidents where Deanna used a weapon to threaten Vickie. Appellant claims that this evidence was admissible because the State had "opened the door" to inquiring about Deanna's character when her mother testified that Deanna was "passive." The State responds that the evidence was properly excluded or, if it was error, the error was harmless.

*Objections and Rulings*

> THE COURT: Mr. Lenox, if you would please narrate your request for the Court.
>
> (BY DEFENSE COUNSEL): Yes, Your Honor. I believe the State has opened the door with their Direct Examination of Ms. Cook to include specific incidents between Deanna and Ms. Cook.
>
> THE COURT: Just so the record is clear, when you say Deanna and Ms. Cook, you're talking about her mother, this witness?
>
> (BY DEFENSE COUNSEL): Yes.
>
> THE COURT: And Deanna, the Complainant?
>
> (BY DEFENSE COUNSEL): Yes, sir.
>
> THE COURT: In particular, there was an incident with a crowbar.
>
> (BY DEFENSE COUNSEL): And there may have also been an incident with another weapon as well that I want to inquire about.

THE COURT: Okay. What incident is that? What kind of weapon?

(BY DEFENSE COUNSEL): A knife.

THE COURT: All right. The State's objection to that is under Rule 611 and also under Rule 403, I believe.

(BY THE PROSECUTOR): Yes, Your Honor. These incidents are not relevant to the matter at hand. This crime is between this defendant and Deanna Cook.

THE COURT: Okay. Would you like to narrate for the record and just make an offer of proof what you intend that that would be or do you want to do it in question and answer? I would prefer an offer, but that's only because of time.

(BY DEFENSE COUNSEL): I would prefer to make an offer outside the presence of the witness.

THE COURT: Okay. Very good.

*

THE COURT: And so the record is clear, I said 611. I meant to say Rule 608.

Go ahead, Mr. Lenox.

(BY DEFENSE COUNSEL): Judge, we'd like to offer testimony regarding Deanna Cook's attack on this witness, Vickie Cook, with a crowbar that was witnessed by a CPS worker at the time that Ms. Cook, Ms. Vickie Cook, was being given custody of Deanna Cook's children and Deanna Cook was angry about that.

We'd also like to inquire of this witness about an incident where she threatened her mother with a knife and see if the witness will confirm that threat.

THE COURT: All right. Even if she does, I find it to be irrelevant and also prohibited by Rule 608, so I'm going to sustain the State's objection.

If at some point during the rest of the trial you feel it becomes relevant, please approach the bench and I'll certainly revisit my ruling on that.

(BY DEFENSE COUNSEL): May we state our objection for the record?

THE COURT: Sure.

(BY DEFENSE COUNSEL): On Direct Examination the prosecution, in talking to the mother, elicited some very broad testimony that she was a very passive person, a very happy-go-lucky person, and not the kind of person that would

attack unless she was … attacked. And we think that testimony, in light of previous instances, casts Deanna's character in a false light. We think we're entitled to impeach that portrayal of her in order to correct what we think is a misstatement in the record.

And I understand the State says they didn't intend the question be that broad. I ask the Court to have the Court Reporter read back the questions. They were not limited to the defendant. It was talking about her general character as being very passive. And so we understand the Court's ruling. We ask the Court please note that objection.

THE COURT: I certainly will. I'm also under the impression and understanding from conversations and also some pretrial hearings that this is not a self-defense case. That's certainly impacting my ruling. If it becomes one, then we can revisit it at that time.

At the close of testimony on the day Vickie testified, the defense made the following proffer of proof:

(BY DEFENSE COUNSEL): The Court has previously ruled on this, but I wanted to make sure we completed this for the record.

If Vickie Cook were on the stand and we were permitted to ask her a question, we would have asked her if Deanna Cook on a previous occasion with CPS presented [sic] had threatened … to hit her with a crowbar. We anticipate her answer would have been yes.

And we would have asked her if on a previous occasion she was present again with CPS when there was a fight with Deanna's sister and Vickie again and that Deanna threatened Vickie Cook with a knife. We anticipate her answer would have been yes.

THE COURT: Thank you, Mr. Anton. I do appreciate that.

The trial court did not alter its ruling.

### *Applicable Rules of Evidence*

The trial court limited appellant's cross-examination of Vickie on the basis of both rule 608 and rule 403 of the Rules of Evidence.

Rule 608 provides that, except for a criminal conviction, a party may not inquire into or offer extrinsic evidence to prove specific instances of a witness's conduct in order to attack or

support the witness's character for truthfulness. TEX. R. EVID. 608(b). Rule 608, by its terms, is very restrictive. *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990).

The rules further provide that relevant evidence is always admissible unless specifically prohibited. TEX. R. EVID. 402. Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. TEX. R. EVID 401. A trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403.

### Scope of Cross-Examination

A witness may be cross-examined on any relevant matter, including credibility. TEX. R. EVID. 611(b). A party has the right to pursue all avenues of cross-examination reasonably calculated to expose bias, motive, or interest for the witness to testify. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). The scope of appropriate cross-examination is necessarily broad. *Id*., *see also Smith v. State,* 352 S.W.3d 55, 64 (Tex. App.—Fort Worth 2011, no pet.).

### Limitations on Cross-Examination

Courts generally prohibit a party from using extrinsic evidence to impeach a witness on a collateral issue. *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009). An issue is collateral if, beyond its impeachment value, a party would not be entitled to prove it as a part of his case tending to establish his plea. *Id.*

However, evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence by leaving a false impression with the jury that invites the other side to respond. *Id*. The false impression must be directly relevant to the offense charged, not to a collateral issue. *Id*. When a witness makes a broad statement of good conduct or character on a

collateral issue, the opposing party may cross-examine the witness with specific instances to rebut that false impression. *Daggett v. State*, 187 S.W.3d 444, 452–54 (Tex. Crim. App. 2005).

For the exception to apply, there must be an unambiguous false impression of law-abiding behavior. *See Delk v. State*, 855 S.W.2d 700, 704– 5 (Tex. Crim. App. 1993). To determine the admissibility of such impeachment evidence, courts consider (1) how broadly the question asked might be interpreted, (2) evidence that might reflect the question's tenor, and (3) the question's relationship to the substantive issues in the case. *Id*. And even when a party opens the door to rebuttal evidence, the trial judge still has the discretion to exclude that evidence under rule 403. *Hayden*, 296 S.W.3d at 554.

### *The State did not "Open the Door"*

Appellant claims that "the State opened the door" to specific instances of conduct by offering evidence of Deanna's "passive" demeanor which left the jury with a false impression. The testimony appellant references, when considered in context, did not broadly portray Deanna as passive:

> Q: (BY THE PROSECUTOR) Okay, Ms. Cook, how would you describe their relationship? How were they together?
>
> A: Rocky. Very rocky. Up and down. Sometimes good, sometimes bad.
>
> Q: Would they argue?
>
> A: Yes.
>
> Q: Would sometimes those arguments become violent?
>
> A: Yes.
>
> Q: Would you say this happened just on occasion or was it pretty regular?
>
> A: Pretty regular.
>
> Q: Pretty regular. Now, would you say that your daughter was a passive person?

A: Yes.

Q: Would she just take it or would she fight back? I guess that's what I'm trying to say.

A: She'd fight back.

Q: She'd fight back. So she wasn't really passive, was she?

A: Kind of. I mean, she was and she wasn't. She defends herself. She didn't, like, start the fight; she defends herself.

\*\*\*

Q: Would sometimes she even injure him?

A: Yes.

\*\*\*

Q: Would she sometimes…use a weapon to defend herself?

A: I heard.

Vickie's testimony that Deanna was "kind of" passive – "she was and she wasn't" – did not create a false impression that Deanna would never be the aggressor in any altercation with appellant. To the contrary, Vickie went on to immediately explain that Deanna would defend herself, she would sometimes injure appellant during their fights, and Vickie had heard that her daughter sometimes used a weapon. As such, her testimony did not create a false impression or merit rebuttal with evidence of specific incidents of violence by Deanna against her. *See Hayden,* 296 S.W.3d at 554  (the trial court acted within its discretion by refusing to allow defendant to present, as rebuttal evidence, evidence that victim was a registered sex offender, for the purpose of impeaching two witnesses who had testified that the victim was a "nice man" because the victim's status as a sex offender was a collateral issue); *cf. Daggett,* 187 S.W.3d at 453 (concluding that a pronouncement that "I have never done anything of that sort with a sixteen year-old girl, period," opened the door to evidence of extraneous misconduct).

### Self-Defense Not Implicated

The trial court made it plain that its ruling took into consideration that there was no claim of self-defense. Nor was there any claim that Deanna's death occurred during an altercation with appellant in which she was the first aggressor. Appellant's defenses at trial were that (1) no murder had taken place at all because Deanna died of a PCP overdose and (2) if Deanna was murdered, he was not the perpetrator. These defenses were consistent throughout the entire trial. Without a defense of self-defense, or some other evidence that Deanna was the first aggressor, any acts of extraneous violence committed against a person or persons other than appellant were not relevant. *Torres v. State*, 117 S.W.3d 891, 895 (Tex. Crim. App. 2003) (holding that there must be some evidence of aggression by the deceased during the events that gave rise to the criminal charges in the case before the defendant may introduce evidence of a prior specific violent act that tends to explain the deceased's later conduct); *Cf. Ex parte Miller*, 330 S.W.3d 610, 619 (Tex. Crim. App. 2009) (holding that a defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor to prove non-character traits such as intent and motive). We conclude that the trial court's ruling limiting appellant's cross-examination of Vickie so as to exclude specific incidents where Deanna used a weapon to threaten Vickie was neither arbitrary, unreasonable, nor an abuse of discretion.

### Any Error is Harmless

The limitation on cross-examination in this case, even if error, is non-constitutional error. *See Johnson v. State*, 433 S.W. 3d 546, 557 (Tex. Crim. App. 2014).

Non-constitutional error that does not affect an appellant's substantial rights is to be disregarded. TEX. R. APP. P. 44.2(b); *Garcia v. State*, 126 S.W.3d 921, 927–28 (Tex. Crim. App. 2004). An appellant's substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence

the verdict or had only a slight influence on the verdict. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *see also Garcia,* 126 S.W.3d at 927–28. In making this determination, we consider the entire record, including the other evidence admitted in the case, the nature of the evidence supporting the factfinder's determination, the character of the alleged error and how it might be considered in connection with other evidence in the case, the State's theory, any defensive theories, closing arguments, and whether the State emphasized the error. *Motilla,* 78 S.W.3d at 355-56.

The jury had before it other evidence that Deanna was not "passive." The record reflects that Deanna and appellant had a tumultuous relationship that sometimes involved violent arguments, and sometimes Deanna would injure appellant. No evidence suggested otherwise. There was evidence that Deanna had been arrested and charged with aggravated assault following one such instance of a violent confrontation with appellant when she stabbed appellant. Appellant's stepfather would not permit Deanna in his home because of her violent nature and the aggressive acts she had committed against his family members. Any error in excluding Deanna's acts against Vickie with a weapon, if any, was harmless.

We conclude that the trial court did not abuse its discretion by limiting appellant's cross-examination of Vickie concerning whether Deanna had ever attacked her with a crowbar, a knife, or any other weapon. We overrule appellant's fifth issue.

### Issue 6: Exclusion of Police Reports

In his sixth issue, appellant claims that the trial court erred by excluding police reports concerning Deanna's conduct. The State responds that the trial court's ruling was correct because the defense offered the reports as business records, a hearsay exception which does not apply to police reports.

*Objections and Arguments*

Outside the presence of the jury, the trial court allowed the defense to make objections and arguments in favor of the admission of certain police reports[11] as business records:

> THE COURT: The other offer that I had before me was police reports under business records exception, which is 803.6 under records of regular conducted activity and also the corollary 902.10; is that right?
>
> (BY DEFENSE COUNSEL): Yes, Your Honor.
>
> THE COURT: Police reports that I understand have to do with other specific instances of criminal behavior of Ms. Cook; is that right?
>
> (BY DEFENSE COUNSEL): Specific instances that we went into yesterday when the State's witness opened the door to that information.
>
> THE COURT: Right. Right. And you're offering those under 803.6?
>
> (BY DEFENSE COUNSEL): Yes, sir.
>
> THE COURT: Okay. I find that those are inadmissible under Cole v State 839 S.W.2d at 808. So for that reason, I'm going to deny your request to do that.
>
> I also note for the record that I believe that you were allowed to test that witness's opinion because she made the statement that she had never seen or heard about Ms. Cook having a weapon. So I allowed you to get into that with that very specific and limited purpose.
>
> That's my ruling on the police reports. You can certainly make a bill on that.
>
> (BY DEFENSE COUNSEL): Your Honor, we'd like to have those introduced for record purposes only.
>
> THE COURT: Sure.
>
> (BY DEFENSE COUNSEL): And then if you'll give us a running objection to the exclusion of that material.
>
> THE COURT: I certainly will, yes, sir.

---

[11] These reports were tendered to the trial court for record purposes after the case was submitted to the jury.

*Standard of Review*

An appellate court reviews a trial court's admission or exclusion of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court does not abuse its discretion if the decision to exclude evidence is within the zone of reasonable disagreement. *Id*.

*Police Reports are not Admissible as Business Records*

Rule 803(8) provides an exception to the hearsay rule for the following:

A record or statement of a public office if:

> (A) it sets out:
>
> (i) the office's activities;
>
> (ii) a matter observed while under a legal duty to report, ***but not including, in a criminal case, a matter observed by law-enforcement personnel***; or
>
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation. . . .

TEX. R. EVID. 803 (8) (emphasis added).

Under the plain language of rule 803(8)(A)(ii), reports made by law enforcement personnel pursuant to their official duties are inadmissible hearsay. *See Cole v. State*, 839 S.W.2d 798, 811 (Tex. Crim. App. 1990) (op. on reh'g). Further, rule 803(8) is a limitation on rule 803(6), the general business records exception. Rule 803(6) cannot be used to avoid the clear strictures of rule 803(8). *See Kennedy v. State*, 193 S.W.3d 645, 659 (Tex. App.—Fort Worth 2006, pet. ref'd). We conclude that the trial court did not abuse its discretion by excluding the proffered police reports from evidence. We overrule appellant's sixth issue.

### Issue 7: Exclusion of Testimony of CPS Investigator

In his seventh issue, appellant claims that the trial court erred by excluding the testimony of a CPS investigator concerning Deanna's conduct during a CPS investigation. The State responds that the trial court acted within its discretion because the evidence was irrelevant and prejudicial.

The State also argues that the testimony was improper character evidence and inadmissible because it was offered only to show specific instances of conduct for character conformity.

*Objections, Proffer of Proof, and Rulings*

> (BY THE PROSECUTOR): … I believe there's going to be a CPS worker that's going to be called by the Defense not as an expert, but I assume as a fact witness, that I believe is going to testify to specific instances of conduct that are contained within the CPS records.
>
> We have an objection to that.
>
> THE COURT: Tell me –
>
> (BY DEFENSE COUNSEL): I think that your previous ruling covers that.
>
> THE COURT: Okay. And certainly if this witness is here and you want to make that part of the bill, I'll certainly allow you to do that whenever you need to.
>
> (BY DEFENSE COUNSEL): Okay.

Outside the presence and hearing of the jury, the defense proffered the testimony of Tricilla Ceballos, a CPS investigator. She received a referral regarding Deanna and her family on April 17, 2012, regarding neglectful supervision and physical abuse of one of Deanna's daughters. The child had some welts on her back. The investigator knew that Deanna had been diagnosed with manic depression, schizophrenia and bipolar disorder; she was supposed to be taking anti-hallucinogenic medication. When interviewed on April 18, 2012, Deanna told the investigator that she was not on her medication and that she had not been taking her medication for a month and a half. There was also a concern that Deanna was neglectful due to her drug usage, specifically PCP, which she had used the day before the CPS interview.

The investigator went to Vickie's house "to meet with the grandmother and the children." Vickie contacted the investigator and told her that Deanna was upset because Vickie had picked Deanna's children up from school. When the investigator arrived at Vickie's house and was getting out of her vehicle to go inside the house, Deanna pulled up in her vehicle and got out with a crowbar. She was very irate. Vickie shouted "the CPS worker is here." When Deanna started

coming towards the investigator's vehicle, the investigator asked her to calm down and put the crowbar down. When she did not, the investigator got on the phone with 911 and told Deanna that the police were being called. At that time Deanna threw the crowbar down, got in her vehicle, and sped off.

The investigator testified that she had no knowledge about the relationship between Deanna and appellant. She also had no information about whether or not Deanna was on her medication in August of 2012. Nor did the investigator know if Deanna continued to use PCP.

At the conclusion of appellant's proffer, the trial court found this testimony was irrelevant under rules 403 and 705(d). TEX. R. EVID. 403, 705(d). The trial court also found that the proffered testimony was improper character evidence and that the specific instances of conduct that the defense sought to admit were for the purposes of showing conformity therewith. Defense counsel made the following objection: "We believe it's relevant because it establishes both … her mental state for not taking her anti-hallucinogenic medications, and PCP use manifests itself in aggressive behavior, which we think are relevant to this case." The trial court continued to deny the defense request.

### Standard of Review

An appellate court reviews a trial court's admission or exclusion of evidence for an abuse of discretion. *Martinez,* 327 S.W.3d at 736. A trial court does not abuse its discretion if the decision to exclude evidence is within the zone of reasonable disagreement. *Id.*

### Exclusion was Not Error under Rule 403

Rule 403 permits a trial court to exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. When undertaking a rule 403 analysis, a trial court must balance (1)

the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

The testimony proffered by appellant related to an incident that occurred four months before the murder. The incident was between Deanna, her mother, and a CPS investigator, not between Deanna and appellant. This incident was unrelated to any conduct alleged in the indictment charging appellant with Deanna's murder. Nor was the evidence probative of any of the circumstances surrounding Deanna's death.

Appellant's defensive theories – that Deanna died of a PCP overdose or, if she was murdered, he was not the murderer – were not dependent upon whether Deanna was capable of aggression or was not taking her anti-hallucinogenic medication. Whether Deanna was taking her medication and continuing to use PCP was not relevant to whether she was murdered by appellant.

The testimony also had at least some potential to emotionally influence the jury in an irrational way, as it would have introduced evidence of a CPS referral and could have led to testimony that Deanna had lost custody of her daughters. Finally, the testimony would have added length to an already long and complex trial, and would have been cumulative of other evidence already before the jury. We conclude that the trial court did not abuse its discretion by excluding this proffered evidence on grounds of relevance.

### *Exclusion was not Error under Rule 404(b)*

Specific bad acts on the part of a victim are admissible only to the extent that they are relevant for a purpose other than to show character conformity. Tex. R. Evid. 404(b)(1) (providing that evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character). There are exceptions to this rule which permit evidence of a victim's prior specific acts of violence when offered for a non-character purpose such as his specific intent, motive for an attack on the defendant, or hostility in the particular case. Tex. R. Evid. 404(b)(2); *Ex parte Miller*, 330 S.W.3d at 620. Case law provides that, "[a]s long as the proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner other than demonstrating character conformity only, prior specific acts of violence may be admitted even though those acts were not directed against the defendant." *Torres v. State*, 71 S.W.3d 758, 762 (Tex. Crim. App. 2002). But there must be some evidence of aggression by the deceased during the events that gave rise to the criminal charges in the case before the defendant may introduce evidence of a prior specific violent act that tends to explain the deceased's later conduct. *Torres,* 117 S.W.3d at 895.

Appellant has not alleged how the proffered evidence of Deanna's aggression with a crowbar towards her mother and a CPS investigator is relevant for purposes other than for character conformity. Appellant argues that the evidence established Deanna's "mental state for not taking her anti-hallucinogenic medications," which, together with her PCP use, manifested itself in "aggressive behavior." Evidence of Deanna's aggression towards her mother and the CPS investigator with a crowbar, however, was only useful to demonstrate that Deanna had a violent character and that she acted in conformity with that violent character on that occasion. This

evidence is not admissible under rule 404(b). We conclude that the trial court acted within its discretion in excluding the proffered evidence. We overrule appellant's seventh issue.

## Issue 8: Admission of Evidence Regarding Radius of Cell Phone Tower

In his eighth[12] issue appellant contends the trial court abused its discretion and erred by overruling his objection to the State's proffer of Kenneth LeCesne, a custodian of records for MetroPCS cellular telephone company and a 28-year veteran of the Dallas Police Department. He contends that LeCesne "was not properly qualified and did not meet the 'Kelly' standards of proof." The trial court held a hearing outside the jury's presence before overruling appellant's objections to LeCesne's testimony. *See* TEX. R. EVID. 702 (witness qualified as expert may testify in form of opinion or otherwise); TEX. R. EVID. 705(b) (voir dire examination of expert about underlying facts or data).

Outside the presence and hearing of the jury, LeCesne testified that, as custodian of records for MetroPCS, he was able to make determinations about locations of phones using his company's technology. According to LeCesne, it is possible to use mobile phone company records to determine the approximate location of a mobile phone during a call. LeCesne explained that when a person makes or receives a call, a signal will go out from the phone and be picked up by a tower, usually the nearest tower with the strongest signal. He explained: "[t]he range of the MetroPCS towers are between a half mile on in up to two miles. So it gives you a general location of where the cellphone was on each individual call." He also explained that he could not testify to a specific, exact location of a phone when a certain call was placed, but could give a "general approximate location" using cell tower records. The records indicate which tower handled each individual call at the start of the call and at the end of the call during the duration of the call. LeCesne stated that

---

[12] This issue is also numbered 9 in the table of contents and summary of issues in appellant's brief. We use the numbering from the argument section of appellant's brief.

this is generally accepted testimony: "During my testimony, and my over 400 cases that I've testified in since 2011, I have done this in just about every single case that I have testified in with regards to call detail records regarding MetroPCS records and maps that were created from the phone logs that were admitted in a specific trial." LeCesne had testified similarly in the trial court just two weeks previously on a different case.

On cross-examination, LeCesne testified that a cellphone "usually connects to the nearest tower with the strongest signal." He explained that the MetroPCS records "indicate which tower handles the specific phone calls from start to finish, where it started, where it ended." He continued, "[a]nd the MetroPCS towers, whichever tower that particular phone call—that handled that particular phone call, the range of that tower will be between a half mile on in up to two miles maximum." During his training process at MetroPCS, LeCesne learned that the half-mile to two-mile maximum ranges "were the ranges that the engineers set those towers at because most of MetroPCS customers are in densely populated areas." But LeCesne conceded that he is not an engineer, and that there is no literature on this process.

At the end of the hearing, the trial court ascertained that LeCesne's testimony fairly and accurately depicted the testimony that the State anticipated from LeCesne. Defense counsel then made the following objection:

> (BY DEFENSE COUNSEL): Obviously we would object to his testimony. In the four standards under *Daubert*,[13] the ability to falsify the data, we don't even know what standard he's using. There's no way for us to verify this two-mile radius is, in fact, accurate.

> He's not an engineer. He's here to testify what [he] was told about the two-mile radius. The two-mile radius is a—has never been published. There's nothing that we have any access to. He can't direct us to any kind of peer-reviewed publication, scientific community that says, yeah, when PCS—when his company says that it's within a two-mile radius, that it is. We don't know what his

---

[13] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993) (scientific expert testimony must be reliable and relevant).

methodological standards are. And we have his word that it's accepted in the scientific community because his engineers told him it was.

So this is an extremely limited showing under *Daubert*. And I want the record to be clear. He can introduce cellphone records. There's no objection to that. He can say what cellphone tower was connected to. No objection to that. But when he tries to say because that was the cell tower used, he had to be in that two-mile radius, there's no basis for that testimony. And really why—electrical engineering should be considered a hard science.

THE COURT: Say that last part again. The what?

(BY DEFENSE COUNSEL): Electrical engineering, communications technology isn't like psychiatry. It's a hard science. It's got to be something you can verify. And those would be the objections.

THE COURT: Okay. Mr. Stock, do you have any response?

(BY THE PROSECUTOR): Yes, Your Honor. I don't believe that we're taking just Mr. LeCesne's word for the technology that he is going to be testifying about. This has been accepted in courtrooms all over the country. It is generally accepted [in] not only all of Dallas County and all over the country, but in this court as well.

The records that he is basing his testimony on have been on file with this Court for over a year. The Defense has had ample time to draw their own demonstrative aids for this testimony.

The fact of the matter is Mr. LeCesne's testimony is accepted in the scientific community and engineering community within the cellular phone industry. It's accepted all over this country. And for those reasons, Your Honor, we would like him to be able to testify the way he testified to during the *Daubert* hearing.

The trial court overruled defense counsel's objections under rules 702 and 705, but granted the defense a running objection to the testimony. To the jury, LeCesne testified that a cell phone "can be directly under the tower, or it can be up to two miles away from the tower during that specific phone call." On cross-examination, LeCesne explained:

Q. (BY DEFENSE COUNSEL) And your testimony, as I understand it, is that a MetroPCS tower has a footprint or a radius of two miles maximum?

A. Not maximum. I'm telling you that during the training, the actual engineers from MetroPCS said that most of the towers are set up between a half mile and two miles. Cellphone towers can be up from zero miles up to 25 miles. The radius—the range is not a finite range, okay? So it can vary depending on

whether it's an open area, farmland area, whether there's buildings, obstructions, things like that.

But "in densely populated metropolitan areas," the cellphone would be within a two-mile radius of the tower.

As explained by the State in its appellate brief, LeCesne's testimony was offered to show the location and movement of Deanna's phone and to refute the defense theory that Deanna "drown[ed] like Whitney Houston," because Deanna's cell phone was not found near her body. LeCesne explained to the jury that according to MetroPCS's records, there was a call from Deanna's cell phone number to 911 at 10:52 a.m. on August 17, 2012, and the call's duration was 17 minutes. Tower 559 "picked up that call." Later calls were picked up by towers 117 and 118. Using demonstrative exhibits that are not included in the appellate record, LeCesne explained to the jury the location of the towers in relation to Deanna's home and appellant's father's home. But on cross-examination, as highlighted by the defense in closing argument, LeCesne testified that the range of a tower is not "finite" and could be "up to six miles." Defense counsel argued, "[t]hat telephone evidence doesn't even show that that phone made any movement whatsoever. Because every tower that it hit is within about the same proximity to that house as the first tower that we know the call went through." The State did not mention LeCesne's testimony or the cell phone evidence in its closing argument.

Appellant argues that LeCesne was "not properly qualified and did not meet the 'Kelly' standards of proof." *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). The court in *Kelly* explained that "evidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Id.* The State responds that (1) LeCesne was properly qualified according to the standards set forth in *Vela,* 209 S.W.3d at 131 and (2) appellant made

no argument in his brief about how the trial court abused its discretion in considering the *Kelly* factors.

As noted above, the three separate conditions for the admissibility of expert testimony are (1) qualification, (2) reliability, and (2) relevance. *Vela*, 209 S.W.3d at 130–31. Appellant's issue challenges only the first condition, LeCesne's qualifications to express an opinion on the radius of a cell phone tower.[14]

LeCesne testified that he had been a records custodian for MetroPCS since August, 2011, and before that had worked for "a large IT company" after his retirement from the Dallas Police Department. Eighteen years of his 28 years of service with the police department were dedicated to drug investigations, including running a task force for the Drug Enforcement Administration. In the course of those responsibilities, LeCesne conducted "between 13 to 15 wiretaps," and explained that he had "been dealing with the cellphones and cellphone records even before I went to MetroPCS. So I do have experience dealing with cellular telephones."

LeCesne's work at MetroPCS began in the subpoena compliance unit, "the unit that controls all of the phone records for the MetroPCS customers." After working in that unit as an analyst for three weeks, receiving and responding to warrants and court orders for records for specific cell phone numbers, LeCesne "had one-on-one training with the subpoena compliance unit supervisor," learning "just the basics of how cellphones work" including sending a signal that the cell phone tower picks up. He also learned how to read the call detail, subscriber, and text message records. Every sixty to ninety days, LeCesne returns to the MetroPCS office for ongoing training. In 2014, he travelled to New Jersey for training on T-Mobile records after T-Mobile bought MetroPCS. He had additional training at the subpoena compliance unit "that involved

---

[14] We note that at the hearing on the admissibility of LeCesne's testimony, the defense did not "challenge qualifications for the hearing." Consequently, most of the evidence regarding LeCesne's qualifications was introduced with the jury present.

engineers that came in and explained the ranges of the towers and explained the antennas on the towers and the side of the towers" and other matters. On cross-examination, LeCesne explained that he had testified "hundreds of times," "all around the country" in his capacity as records custodian for MetroPCS.

To determine whether a trial court abused its discretion in evaluating a witness's qualifications as an expert, "an appellate court should consider three criteria": "(1) is the field of expertise complex? (2) how conclusive is the expert's opinion?; and (3) how central is the area of expertise to the resolution of the lawsuit?" *Vela*, 209 S.W.3d at 131 (internal quotations and citations omitted).

In *Robinson v. State*, 368 S.W.3d 588, 600–01 (Tex. App.—Austin 2012, pet. ref'd), the court considered this issue. In *Robinson*, the appellant contended that the trial court erred by denying his motion to exclude the testimony of Sheriff's Deputy Ben Wright, who used cell phone records to track the appellant's whereabouts on the date of a murder. The court described Wright's testimony:

> [Wright] stated that when cell phones place or receive calls, they "reach out" to connect to the nearest cell tower, which must be within a two-mile radius of the phone's location in order to receive a signal. . . . Based on this data, Deputy Wright testified that he could plot the location of each cell tower that Robinson's calls were relayed to in order to track Robinson's location within a two mile radius.

*Id.* The court first considered whether the field of expertise was complex. *See id.* The court concluded that the process of tracking the location of the appellant's cell phone to a particular geographic area by using the locations of the cell towers, was "not particularly complex":

> This process, as described by Deputy Wright, involved reading and analyzing cell phone records based on a general understanding that cell phones connect to the nearest tower location when a call is placed. The analysis is straightforward and not particularly complex.

*Id.* at 601. Especially given LeCesne's training and experience, we conclude the first *Vela* factor weighs in favor of admitting his testimony. *See Vela*, 209 S.W.3d at 131.

–53–

And as in *Robinson*, we conclude that the second and third *Vela* criteria weigh in favor of admitting LeCesne's testimony. *See Robinson*, 368 S.W.3d at 601. LeCesne's testimony was neither conclusive nor dispositive. As the defense argued, the jury could find that LeCesne's testimony did not connect appellant to the crime. And, as we discuss below, the jury heard other ample evidence to connect appellant to Deanna's murder. *See id.* The State did not mention the evidence in its closing argument.

We also conclude that the trial court did not abuse its discretion in determining that LeCesne's testimony satisfied the criteria for reliability under *Kelly*. *See Kelly*, 824 S.W.2d at 573. As the State has noted, appellant does not explain how LeCesne's testimony failed to meet *Kelly*'s standards. LeCesne testified:

> Q. And in addition to that, Mr. LeCesne, is this technology that you're testifying about today, is this technology generally accepted within the scientific community and within the mobile phone industry?
>
> A. The records that are created by cellular cellphone companies are actually in compliance with Federal law. The CALEA Act, the Consolidated Assistance Law Enforcement Act, was a bill that was signed in 1994 by President Clinton when cellphones became really active. It was a way to enhance the Government's ability to actually be able to track where cellphones were. All phone companies, cellular telephone companies, have to be in compliance with that law. The law also limited and set up certain rules that law enforcement, Federal law enforcement, and local law enforcement, that were—they were responsible for following with regards to how they get these records of these cellphone logs.

Numerous courts of appeal have concluded that trial courts did not err by admitting similar evidence, including cell phone records, cell tower data, and testimony by police officers with similar training and experience. *See, e.g., Robinson*, 368 S.W.3d at 599–602; *Thompson v. State*, 425 S.W.3d 480, 488–89 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (evidence showing that appellant's mobile phone was active in general vicinity of murder scene was admissible); and *Wilson v. State*, 195 S.W.3d 193, 200–02 (Tex. App.—San Antonio 2006, no pet.) (concluding the trial court did not abuse its discretion by admitting testimony by custodian of cellular phone

records about "incoming and outgoing calls, cell tower locations and general technology with regard to tracking cellular calls").[15] We conclude the trial court did not abuse its discretion in concluding that LeCesne was properly qualified and that his testimony met the applicable standards for admission. *See Vela*, 209 S.W.3d at 131: *Kelly*, 824 S.W.2d at 573. We decide appellant's eighth issue against him.

### Issue 9: Exclusion of Evidence re Family Violence Case of State's Witness

In his ninth[16] issue appellant contends the trial court erred by "denying appellant's cross-examination of the State's witness, Debbie Lawson, as to the facts that she had been involved in a family violence case with her husband to show bias and motive to testify." On direct examination, Lawson testified that in August 2012, she was a mail carrier for the Teagarden Place subdivision, including Crimson Court where Deanna lived. On August 17, 2012, at approximately 10:40 a.m., Lawson saw Deanna walking down the street toward her house. Deanna was accompanied by a male. Lawson testified that she told police the man "looked to be the guy that was on TV" in a news report about Deanna's death. She could not recall whether the two were arguing. Although pressed by the State to agree that she told police at the time that the man was appellant, and that appellant and Deanna were arguing, she said only that she did not recall what she told police. She

---

[15] Other courts, including this Court, have reached similar conclusions in opinions not designated for publication. *E.g., Patterson v. State*, No. 05-13-00450-CR, 2015 WL 2400809, at *9–10 (Tex. App.—Dallas May 19, 2015, pet. ref'd) (not designated for publication) (trial court did not err by allowing police detective with twelve years' experience to testify as expert in interpretation of cell phone and cell tower data); *Wallace v. State*, No. 09-16-00312-CR, 2018 WL 2324389, at *6–8 (Tex. App.—Beaumont May 23, 2018, no pet. h.) (mem. op.) (not designated for publication) (collecting cases, and concluding trial court's admission of officer's cell phone tower testimony as lay opinion was not error); *Ward v. State*, No. 14-15-00473-CR, 2016 WL 6238339, at *8–10 (Tex. App.—Houston [14th Dist.] Oct. 25, 2016, pet. ref'd) (mem. op.) (not designated for publication) (trial court did not abuse discretion by admitting expert testimony by police officer about location of appellant's cell phone during robbery based on cell phone and cell tower records); *Saenz v. State*, No. 13-10-00216-CR, 2011 WL 578757, at *3 (Tex. App.—Corpus Christi Feb. 17, 2011, pet. ref'd) (mem. op., not designated for publication), *habeas corpus granted on other grounds sub nom. Ex parte Saenz*, 491 S.W.3d 891 (Tex. Crim. App. 2016) (trial court did not err by admitting testimony of police detective regarding location of appellant's cell phone at time of murder based on cell phone and cell tower records).

[16] This issue is also numbered 8 in the table of contents and summary of issues in appellant's brief. We use the numbering from the argument section of appellant's brief.

also "could not recall" if, when she met with police in 2012, she said she was sure the man she saw arguing with Deanna was appellant.

On cross-examination, the trial court sustained the State's objection to the question, "You've been involved in a family violence case yourself, haven't you?" Later, out of the presence of the jury, the defense argued for admission of the evidence:

> Ms. Lawson had indicated in her interview with the detective that she has been the alleged perpetrator in a family violence incident with her husband while they lived in Missouri prior to her moving to Texas. I wanted to go into that because I believe that it may suggest a specific motive or bias on her part as to why she would want to get involved in this case where she clearly had no recollection about who she saw on August 17th.

The State responded that "[t]he case went nowhere in Missouri," and because Lawson was the perpetrator, "I don't see how that could show any potential bias against the defendant in this case." The trial court sustained the State's objection. A video of Lawson's interview with police containing information about Lawson's arrest for domestic violence in Missouri was admitted for record purposes.[17]

Appellant contends he was denied his constitutional right of confrontation because he was not permitted to cross-examine Lawson about her bias, interest, or motive in testifying as she did, or to introduce extrinsic evidence to establish her motive if she denied it.

The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. CONST. amend. VI. This guarantee was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Pointer v. State,* 380 U.S. 400, 403 (1965); *see also* TEX. CONST. art. I, § 10.

---

[17] A police detective interviewed Lawson to determine what she saw on the morning of Deanna's death. Exhibit 166 is a video recording of the interview. A portion of the video was played for the jury, based on the trial court's ruling permitting extrinsic proof of two prior inconsistent statements under rule of evidence 613. But the information about Lawson's involvement in a family violence case was excluded.

The right to confrontation includes the right to cross-examine a witness to attack her general credibility or to show her possible bias, self-interest, or motives in testifying. *Davis v. Alaska,* 415 U.S. 308, 316 (1974); *Hammer v. State,* 296 S.W.3d 555, 561 (Tex. Crim. App. 2009).

As noted above, a defendant has the right to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify and, therefore, the scope of appropriate cross-examination is necessarily broad. *Carroll,* 916 S.W.2d at 497; *see also Smith,* 352 S.W.3d at 64. However, although "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original). Accordingly, the trial court had wide discretion in limiting the scope and extent of cross-examination for a number of reasons, including the prevention of harassment, prejudice, confusion of the issues, and marginally relevant interrogation. *Irby v. State,* 327 S.W.3d 138, 145 (Tex. Crim. App. 2010) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)); *Lopez v. State,* 18 S.W.3d 220, 222 (Tex. Crim. App. 2000).

"The proponent of evidence to show bias must show that the evidence is relevant. The proponent does this by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party." *Woods v. State,* 152 S.W.3d 105, 111 (Tex. Crim. App. 2004). The trial court does not abuse its discretion by excluding evidence of alleged bias or motive if the defendant's offer of proof does not establish the required nexus. *Id.* at 111–12; *Smith,* 352 S.W.3d at 64. Each Confrontation Clause issue is viewed on a case-by-case basis. *Lopez,* 18 S.W.3d at 222.

Here, appellant failed to establish a logical connection between Lawson's identification of appellant and her potential motive to testify in favor of the State, or in Deanna's favor. *See Woods*,

–57–

152 S.W.3d at 111. Lawson's arrest as the perpetrator of domestic violence in Missouri does not suggest a motive or bias against a defendant in a murder case, nor a motive to testify in favor of the State or Deanna. Even if charges were still pending in Missouri, there is no logical relationship between them and Lawson's testimony in a different state on an unrelated matter. *See Carpenter v. State*, 979 S.W.2d 633, 635 (Tex. Crim. App. 1998) ("Appellant does not argue, and the record does not demonstrate, why prosecution by the federal government for theft and conspiracy to possess and distribute controlled substances would tend to show that the witness' testimony in this unrelated state prosecution for tampering with government documents might be biased."); *see also Johnson v. State*, 433 S.W.3d 546, 555 (Tex. Crim. App. 2014) (defendant's right to confrontation not violated by trial court's refusal to allow impeachment with evidence of specific pending felony charges or ranges of punishment attendant to the charges). Accordingly, the trial court did not abuse its discretion by sustaining the State's objection to cross-examination of Lawson on the subject. We decide appellant's ninth issue against him.

## Issue 10: Evidence Authenticating the 911 Call

In his tenth issue, appellant claims that the trial court erred in overruling his objections to the admission of State's Exhibit 58, the recording of the 911 call placed on August 17, 2012. Appellant claims that the voice of the 911 operator was not properly authenticated and that admission of the 911 recording violated his right to confrontation because the 911 operator was not called as a sponsoring witness. The State responds that appellant's issue is inadequately briefed, multifarious, and without merit.

*Background*

During Vickie's testimony, the State made the following offer of proof:

> Q. (BY THE PROSECUTOR) Ms. Cook, I'm showing you what's been marked as State's Exhibit No. 58.
>
> Do you know what this is?

A. Yes.

Q. Does this contain the 911 call placed by your daughter on the 17th of August, 2012?

A. Yes.

Q. Have you listened to this tape?

A. I have.

Q. Can you identify voices on this tape?

A. I can.

Q. Can you identify the voice of your daughter on this tape?

A. I can.

Q. Can you identify the voice of the defendant on this tape?

A. I can.

Q. Is there also the 911 operator on this tape?

A. Yes.

(BY THE PROSECUTOR): Your Honor, I'm going to offer State's Exhibit 58. Tendering to Defense.

Defense counsel objected on grounds that there was a lack of predicate because there had been "no showing that she knows the 911 operator." The defense argued that the 911 operator was a necessary witness "to prove up the authenticity of this recording." Defense counsel also argued that appellant had a confrontation right to cross-examine the 911 operator. The trial court overruled these objections and admitted the exhibit.

### Standard of Review

We review a trial court's ruling on authentication issues under an abuse of discretion standard. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). We will uphold a trial

court's admissibility decision when that decision is within the zone of reasonable disagreement. *Id.*

### *Authentication of the 911 Call*

To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. TEX. R. EVID. 901(a). The rule further provides that, by way of illustration and not by way of limitation, the following are examples of authentication or identification:

> (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
> . . .
>
> (4) Distinctive Characteristics and the Like. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
>
> (5) Voice identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at anytime under circumstances connecting it with the alleged speaker.

TEX. R. EVID. 901(b). This rule governs the admissibility of electronic recordings. *Jones v. State*, 80 S.W.3d 686, 688 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Conclusive proof of authenticity of disputed evidence is not required before allowing admission. *Fowler*, 544 S.W.3d at 848. Rule 901 merely requires some evidence to support a finding that the evidence in question is what the proponent claims it to be. *Id.*

Here, Vickie testified that she recognized the voices of her daughter and appellant on the recording of the 911 call. Voice identification may be based on hearing a voice and recognizing it. *See Wilson v. State*, 884 S.W.2d 904, 906 (Tex. App.—San Antonio 1994, no pet.). Vickie spoke to Deanna almost every day and was familiar with her voice. Vickie had known appellant for several years; she had spoken to him in person on the Sunday before Deanna's death and at least twice by telephone between Friday, August 17, 2012, and when she found her daughter's body on

Sunday, August 19, 2012. And, a sponsoring witness need not identify every voice on a recording. *Banargent v. State*, 228 S.W.3d 393, 401 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd); *Jones*, 80 S.W.3d at 689 (the Court stated that it was unwilling to read into rule 901 a requirement that each person, no matter how irrelevant to case, be identified by name).

Voice identification may also be based on what is said in the conversation. *Wilson,* 884 S.W.2d at 906. Here, the voice identified as the 911 operator initially identifies herself: "Dallas 911, this is Tonyita, what is your emergency?" Several minutes into the call the operator again identifies herself: "Hello. This is Tonyita Dallas 911." The operator asks five times if police, fire or ambulance are needed. Though Vickie did not identify the 911 operator by name, it is evident on the recording that the third voice is the 911 operator. The content of the recording and the circumstances under which it was made – a 911 call from Deanna reporting an assault in progress – support its authenticity. *See* TEX. R. EVID. 901(b)(4).

We conclude that the State adequately authenticated the 911 tape by (1) Vickie's voice identification of both Deanna and appellant and (2) by showing that the tape was what the State claimed it to be, *i.e.*, the 911 call placed on August 17, 2012.[18]

*Confrontation*

As noted above, an accused has the right to be confronted with the witnesses against in all criminal prosecutions. U.S. CONST. amends. VI, XIV; see also TEX. CONST. art. I, § 10; *Pointer,* 380 U.S. at 406.

The U.S. Supreme Court has held that the Confrontation Clause does not allow admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to

---

[18] Subsequent to the admission of the 911 recording, Kenneth LeCesne, the custodian of records for MetroPCS testified that the business records of his company reflected that a phone call from Deanna's phone was placed to 911 on August 17 at 10:52 a.m. and lasted for 17 minutes and 21 seconds. Telephone conversations may be authenticated by evidence that a call was made to the assigned number to a particular business. TEX. R. EVID. 901(b)(6)(B); *see also Esnard v. State*, No. 05-02-01812-CR, 2003 WL 22332395, at *2 (Tex. App.—Dallas Oct. 14, 2003, no pet.) (not designated for publication) (authenticating a 911 call through business records).

testify, and the defendant had a prior opportunity for cross examination. *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004). The threshold inquiry for any alleged confrontation violation involving the admission of a statement is whether the admitted statement is testimonial or nontestimonial in nature. *Davis v. Washington*, 547 U.S. 813, 822 (2006); *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008). Statements on 911 calls that relate to ongoing emergencies, and do not establish historical facts, are non-testimonial and do not implicate the Sixth Amendment. *Davis,* 547 U.S. at 822. Statements made during an ongoing emergency that identify one's attacker are similarly non-testimonial. *Michigan v. Bryant*, 562 U.S. 344, 356 (2011).

Here, the only questions asked by the 911 operator were if "police, fire or ambulance" were needed; these questions went unanswered. The only factual assertions that the 911 operator made was, if the caller did need services, then "I need an address," which was not testimonial. The only real questions the operator could answer if called as a witness would have been to give her name and identify her voice on the recording. We conclude that the content of the tape was admissible as non-testimonial evidence.

We conclude that the trial court did not abuse its discretion in admitting the recording of the 911 call placed on August 17, 2012. We overrule appellant's tenth issue.

### Issue 11: Transcription of the 911 Call

In his eleventh issue, appellant claims that the trial court erred by admitting, for demonstrative purposes, a written transcript of the 911 call placed on August 17, 2012. Appellant claims that, in addition to erroneously admitting the recording of the 911 call, the trial court "compounded the error by allowing an unauthenticated transcript of the call to be available to the jury to view while listening to the played recording." The State responds that this issue is inadequately briefed, multifarious, and without merit because demonstrative aids are admissible within the trial court's discretion.

*Objection and Ruling*

After the trial court admitted State's Exhibit 58, the recording of the 911 call, the State then offered State's Exhibit 112, a written transcript of that call for demonstrative purposes. The defense objected to the transcript as not being an accurate interpretation of the 911 call, specifically in regards to portions of the recording that the defense felt were inaudible, and that the conclusions given to the inaudible sections by the State were not accurate. Defense counsel asked that the jury be allowed to listen to the recording and come to their own conclusions about "what's heard or not heard." Defense counsel did not identify which portions of the transcript he believed were inaccurate, nor did he identify which portions of the recording he believed were inaudible. The transcript of the recording, however, contains the reference "inaudible" seventeen times.

The trial court overruled these objections and admitted the exhibit for demonstrative purposes. The trial court explained the meaning of its ruling to the jury and gave the following limiting instruction:

> THE COURT: What that means, ladies and gentlemen, is that there is a transcript that will be given to you to aid you, if it does aid you, in understanding what's on the recording. If, however, you hear something that is in conflict with what's on the transcript, you go with the exhibit that has been admitted into evidence, which is State's Exhibit No. 58.[19]

The trial court granted the defense a running objection to its ruling.

Copies of the written transcript were handed to the jurors, the actual recording was played for the jury, and copies of the written transcription were collected from the jurors after the conclusion of the playing of the recording. There is nothing in the record to suggest that the jurors ever saw the transcript again.

---

[19] State's Exhibit 58 is the recording of the 911 call.

*Preservation*

Appellant's complaint, as stated in his brief, is that the written transcript was not authenticated. Appellant's complaint at trial, however, was that the transcript was not an accurate interpretation of the 911 call, particularly with respect to the "areas that we feel are inaudible." This is not the same complaint that appellant makes on appeal, *i.e.*, that the transcript was not authenticated.

To preserve error for appellate review, the record must establish that the request or objection made in the trial court "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). Issues on appeal must comport to the objections or requests made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (*citing Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)).

Consequently, we conclude that appellant has not preserved this issue for our review.

*No Reversible Error is Demonstrated*

Even if we were to conclude that this issue was preserved, we would not conclude there is reversible error.

We review the admission of demonstrative evidence for abuse of discretion. *See Simmons v. State*, 622 S.W.2d 111, 113 (Tex. Crim. App. 1981). Transcripts may be used as jury aids when the jury is listening to an audio recording if (1) the defendant is given an advance copy and adequate time to review and contest it,[20] (2) the transcript is not admitted as evidence, and (3) the trial court provides a limiting instruction. *Garrett v. State*, 658 S.W.2d 592 (Tex. Crim. App.

---

[20] The record does not indicate if appellant was given an advance copy of the transcript. However, appellant did not complain at trial, and does not complain on appeal, that he was denied an advance copy of the transcript or adequate time to review and contest it.

1983); *see also Garner v. State*, 939 S.W.2d 802, 807 (Tex. App.—Fort Worth 1997, pet. ref'd) (stating that "[c]ounsel . . . is permitted to use jury aids which are not admitted into evidence . . . to assist the jury in understanding the evidence actually introduced."); *Burns v. State*, No. 07-15-00229-CR, 2016 WL 1391066, at *2-3 (Tex. App.—Amarillo Apr. 1, 2016, pet. ref'd) (not designated for publication) (concluding that it was not an abuse of discretion to admit a transcript of a recording where the defendant received the transcript prior to trial and had an opportunity to attack it in a pretrial hearing, the person who made the recording stated that the transcript accurately reflected what appeared on the recording, the transcript was not admitted into evidence, and distribution to the jury was accompanied by a limiting instruction that any conflict between the audio recording and the transcript must be resolved in favor of the audio recording); *Goodlow v. State*, No. 01-99-00185-CR, 2000 WL 19650 (Tex. App.—Houston [1st Dist.] January 13, 2000, pet. ref'd) (not designated for publication) (stating that "[t]he jurors may refer to a transcript when: it is not introduced into evidence; the jury is allowed to read the transcript only during the playing of the recording; and the jury is properly instructed regarding the limited use of the transcript"). The exact wording of the limiting instruction is up to the discretion of the trial court as long as it informs the jurors that the transcript is not evidence and that if they hear something on the recording that differs from the transcript, they should rely on what they heard. *Garner*, 939 S.W.2d at 806. Unofficial transcriptions have also been approved as demonstrative aids. *Mayhue v. State*, 969 S.W.2d 503, 506–07 (Tex. App.—Austin 1998, no pet.)(concluding that an unofficial transcript of an audio recording of defendant's conversation with an investigator was admissible to aid the jury in understanding the recorded conversation where the jury was instructed that the transcript was merely an aid, the transcript read "inaudible" where it corresponded to portions of the conversation that were indecipherable because of background noise, and there were no material differences between recorded conversation and transcript).

Here, prior to the distribution of copies of the written transcription of the 911 recording to the jurors, the trial court gave the jury a limiting instruction. The jurors were instructed that they were allowed to use the transcription while listening to the recording but, in the event of a discrepancy, they were to rely on the actual recording. The recording of the 911 call was played for the jury in open court. The jury heard the actual recording and was the judge of its contents. As previously stated, appellant did not point out any specific discrepancies between the recording and transcript at trial, nor does he on appeal. *Compare Mayhue*, 969 S.W.2d at 507. The transcripts were collected after the recording was played and were not in evidence to the extent that the jury could refer to those transcripts during its deliberations.

We conclude that the trial court did not abuse its discretion by admitting the written transcription of the 911 recording for demonstrative purposes. We overrule appellant's eleventh issue.

## Issue 12: Sufficiency of the Evidence

In his twelfth issue, appellant claims that the evidence is insufficient to sustain his conviction for murder. Appellant argues, in the alternative, that there is no evidence to show that a murder was committed at all, or, if it was, that he was the perpetrator. The State responds that a rational jury could conclude that Deanna was murdered and that appellant murdered her.

### *Standard of Review*

A challenge to the sufficiency of the evidence is evaluated under the standards established in *Jackson v. Virginia* 443 U.S. 307, 316 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894–95. This standard of review for legal sufficiency is the same for both direct and circumstantial evidence. *Wise v. State*,

364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001).

We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 898–99; *Haywood v. State*, 344 S.W.3d 454, 458–59 (Tex. App.—Dallas 2011, pet. ref'd). We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899.

When the record supports conflicting inferences, we must presume that the factfinder resolved those conflicts in favor of the prosecution and defer to that determination. *Jackson*, 443 U.S. at 326; *Wise,* 364 S.W.3d at 903. The State need not disprove all reasonable alternative hypotheses that are inconsistent with appellant's guilt. *Wise*, 364 S.W.3d at 903. Rather, we consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Hooper*, 214 S.W.3d at 13.

### *Corpus Delecti of Murder was Established*

The corpus delecti of murder is established if the evidence shows the death of a human being caused by the criminal act of another. *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993). The State may prove corpus delecti by circumstantial evidence. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

Deanna's decomposing body was found face down in the bathtub of her home two days after her mother last spoke with her. Her feet were hanging over the side of the bathtub. There were no noticeable bruises of any kind on the body. She was otherwise a physically healthy thirty-two year old woman.

In arriving at a cause and manner of death, the medical examiner not only conducted an autopsy but also reviewed other available material, including the recording of the 911 call. The medical examiner determined that Deanna died as a result of drowning and other homicidal violence. Asphyxiation from drowning was also consistent with her findings.

Appellant claims that the medical examiner's determination of the cause and manner of Deanna's death was flawed and based on an incomplete investigation. Appellant argued at trial and continues to argue on appeal that Deanna overdosed on PCP and fell asleep in the bathtub, much like "the death of Whitney Houston," who overdosed in her bathtub.

*Evidence of PCP Use and Its Effects*

There was no dispute that Deanna was a long-time user of PCP. The defense elicited evidence that the word "wet" is a slang term for PCP and that PCP users commonly refer to themselves as "weters." Deanna had a multicolored tattoo of a fish with the word "WETER" on her left buttock. Defense counsel argued: "I can only imagine that you must really be into PCP to tattoo something like that on your body." There was testimony that PCP can cause hallucinations, delusions and even suicidal ideations. The jury also heard that there are documented cases in which people die from using PCP alone.

Nor was there any dispute that PCP was found in fluid taken from Deanna's chest cavity in an amount of .20. The medical examiner testified that this amount was scientifically inaccurate, for purposes of determining how much PCP was in Deanna's system and how it was affecting her at the time of her death, because a calculation could not be based on the fluid available for testing. The medical examiner testified that it was impossible to tell when Deanna last used PCP, only that it was sometime prior to her death. The medical examiner was of the opinion that PCP did not contribute to Deanna's death.

The defense expert, Dr. Wimbish, testified that PCP "is a hallucinogenic material that produces alterations of mental facilities which can result in death." He reviewed the autopsy report for Deanna and testified that at the time of her death, the amount of PCP in her system was above the minimum concentrations "associated with fatality." He agreed with defense counsel that "there are documented cases of people dying from PCP related fatalities with the concentration that was found there." Dr. Wimbish also testified that people could also die from using PCP in stressful situations. It was his opinion that PCP should be considered a contributing factor in Deanna's death.

Dr. Wimbish also admitted, however, that he could not give a cause of death for Deanna and could not say that PCP caused her death. He did not really dispute the medical examiner's findings: "I think the medical examiner put down what they thought."

In order to believe appellant's theory that Deanna's death was due to a PCP overdose, the jury would have needed to discount the male voice, in addition to Deanna's voice,[21] on the 911 call placed on August 17, 2012. While the defense suggested to the jury that Deanna was in the grip of a PCP hallucination or delusion, the male voice can be plainly heard on the recording of the 911 call. The male voice says that he is going to kill Deanna ten times. Deanna is heard pleading with this man; she asked him to "stop" seventeen times and used the word "please" forty-four times. The male voice orders her to "get down" seven times. Rational jurors could have found beyond a reasonable doubt that the man whose voice was on the 911 call murdered Deanna.

The jury, as the judge of the credibility of the witnesses, could have chosen to believe that Deanna's death was due to drowning and other homicidal violence and not a PCP overdose.

---

[21] There was no dispute at trial that the female voice on the 911 recording was Deanna.

*Other Evidence of a Murder*

There is other evidence in the case from which a rational jury could have concluded that Deanna's death was a murder.

Responding police officers testified at trial that, in an otherwise neat and tidy home, Deanna's bedroom was in a state of disarray and the bedroom door had been forced open. It appeared to the officers as if a significant struggle had occurred in the bedroom. A rational jury could have concluded from this evidence that Deanna struggled with her murderer.

And, while Deanna initiated the call to 911, her phone was not found either in the bathroom or elsewhere in her home. If she had accidentally drowned as a result of an overdose, it would be logical to find her phone near her body. The call from Deanna's cell phone to 911 was placed at 10:52 a.m. and lasted just over 17 minutes; cell tower 559 picked up that call. Calls were made from that same phone later in the day and were picked up by towers 117 and 118. A rational jury could have inferred that Deanna's murderer took her phone.

### Whether Appellant Murdered Deanna

Appellant also claims that, even if Deanna was murdered, there is no evidence to prove that he is the murderer.

As detailed above, appellant and Deanna had a long, tumultuous relationship with a documented history of violent, physical fights in which they would injure each other. At least one police officer, as well as Deanna's mother, advised her to terminate her relationship with appellant. Deanna told a 911 operator in a call placed on August 16, 2012, the day before her death, that appellant had already tried to kill her three times.

In the hours leading up to Deanna's death, the landline at the house where appellant was staying called Deanna's cellphone 164 times.

On the 911 call, Deanna calls the male whose voice is heard "Delvecchio" six times. She calls him "Red," which was appellant's nickname, eleven times. And she refers to him as "Baby." A rational jury could have concluded that Deanna was sufficiently lucid to identify her attacker, and ultimately her murderer, to the 911 operator.

In addition to both appellant's name and nickname being used by Deanna on the recording, both Vickie and Detective Chaney identified the male voice on the 911 recording as appellant's voice. The defense tried to discredit Vickie's voice identification on grounds of her "extreme vengeance and bias" against appellant. The defense tried to discredit Chaney's voice identification on grounds the detective had overstated his involvement with appellant and had not seen him in many years. However, the jury, as the judge of the evidence and the credibility of the witnesses, was entitled to believe either Vickie, Chaney, or both. And jail calls undisputedly placed by appellant were played for the jury; the jurors could have compared appellant's voice on the jail calls to the male voice heard on the 911 recording and judged for themselves.

Additionally, appellant could not be excluded as a contributor of DNA found under Deanna's fingernails. The jury could have concluded that this was further evidence of a struggle between Deanna and appellant which resulted in her death.

***Conflicting Evidence and Inconsistencies***

Lawson, the postal carrier in Deanna's neighborhood, testified that at approximately 10:40 a.m. she saw Deanna walking with a man. She originally told law enforcement officials that this man was appellant, but at the time of trial could not be sure of her identification. By contrast, Williams, a neighbor, was positive that the man he saw wearing only shorts sitting on the trunk of a white car at 11:30 a.m. on August 17 was appellant.

Hardaway testified that she heard appellant confess to the murder in the jail in the presence of another inmate, Clint Stoker. Stoker denied ever engaging in this conversation or hearing this confession. The defense also produced jail records in an effort to discredit Hardaway's testimony.

The presence of two male DNA profiles in a vaginal swab taken from the autopsy, to which appellant was not a contributor, proves that Deanna had contact with two unknown males sometime prior to her death. The defense argued that this reflected an incomplete investigation by the police because no effort was made to find these two males.

Appellant's stepfather testified that appellant stutters when he speaks. Detective Chaney, however, testified that he had never heard appellant stutter.

Dr. Compton testified that she "could not detect any water splashing" on the recording of the 911 call. She agreed with defense counsel that if a person were actually experiencing a drowning by water, she would expect to hear water splashing. However, Dr. Compton also testified that she thought she detected the sound of a faucet and water running. The medical examiner heard sounds of water and sounds of distress on the recording and Vickie testified that there was a point on the call where she heard water running and also a point in that call where it sounded like Deanna's voice had changed because she was pushed down into that water.

We presume that the jury, as the factfinder, resolved conflicts in favor of the prosecution and defer to that determination.

When viewed in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to prove that Deanna was murdered by appellant. We overrule appellant's twelfth issue.

## Issue 13: Admission of Exhibits during Punishment Phase

In his thirteenth issue appellant complains that the trial court erred by overruling his objection to State's Exhibits 117, 118, 120, 121, 123, 124, and 127[22] because "there was a lack of identification fingerprints to apply these judgments of convictions to appellant." He argues that he was "denied due process and a fair trial when the trial court allowed the State to use the complained of inadmissible evidence to prejudice him before the sentencing jury." He contends "the only proper remedy" is a new punishment hearing.

Even if the trial court erred by admitting the exhibits into evidence, however, we must disregard the error unless it affected appellant's substantial rights. *Garcia,* 126 S.W.3d at 927; TEX. R. APP. P. 44.2(b). Under rule 44.2(b), we may not reverse for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Garcia*, 126 S.W.3d at 927.

In the punishment phase of a trial, "evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant . . ." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2017). Although the trial court "has the responsibility of determining the threshold admissibility of extraneous offenses in the punishment phase," the jury is the exclusive judge of the facts to determine whether the State has proved the extraneous offenses beyond a reasonable doubt. *Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996).

---

[22] Appellant's inclusion of State's Exhibit 127 appears to be an error. Unlike the other five exhibits complained of in appellant's thirteenth issue, State's Exhibit 127 is a photograph, not a record of a purported prior conviction, and it was admitted only for record purposes after the trial court sustained appellant's objection to its admission. Appellant makes no argument in his thirteenth issue about a photograph or about State's Exhibit 127 specifically. Consequently, we do not consider appellant's reference to State's Exhibit 127 further.

To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). No specific document or mode of proof is required to prove these two elements. *Id.* But the State must meet its burden of proving that the person named in the prior convictions is the same person as the defendant in the instant case. *Alridge v. State*, 732 S.W.2d 395, 396 (Tex. App.—Dallas 1987, pet. ref'd).

During the punishment phase of the trial, the State called Officer Margaret Brown-Lewis, who "identif[ies] subjects by their photos and by their fingerprints" in her work as a deputy in the Dallas County Sheriff's Department. Brown-Lewis has worked for the department for 21 years. She took a ten-print fingerprint card of appellant that was admitted into evidence for record purposes without objection as State's Exhibit 125. Brown-Lewis next identified State's Exhibit 119, a penitentiary packet, and testified that the fingerprints in State's Exhibit 119 matched appellant's fingerprints in State's Exhibit 125. Similarly, Brown-Lewis identified State's Exhibit 122 as a judgment of conviction, and testified that the fingerprints in the exhibit matched appellant's fingerprints on State's Exhibit 125. State's Exhibits 119 and 122 were admitted into evidence for all purposes and published to the jury. The offense reflected in State's Exhibit 119 was the only offense used for enhancement purposes in the punishment charge.

Brown-Lewis testified that State's Exhibits 117, 118, 120, and 121 were certified computer printouts of court records from cases in 1993 and 1994. She testified that because the records did not include fingerprints, she could not compare them to State's Exhibit 125. Brown-Lewis also testified that State's Exhibits 123 and 124, judgments of convictions, contained appellant's name and date of birth. State's Exhibits 123 and 124 are records of 2009 and 2011 assaults on Deanna, the victim in this case. Brown-Lewis testified that she had not compared fingerprints in State's Exhibits 123 and 124 to State's Exhibit 125.

Brown-Lewis testified that the name and date of birth in State's Exhibits 117, 118, 120, 121, 123, and 124 were the same. She also testified that in her opinion, appellant's name, Delvecchio, was "unique." She also testified that appellant's address was the same in State's Exhibit 118 as in State's Exhibit 119, the penitentiary packet that was already in evidence.

Appellant objected to the admission of State's Exhibits 117, 118, 120, 121, 123, and 124 "on the grounds that they have not been specifically and definitely identified to this defendant." Citing *Flowers*, the State responded that "fingerprints are not the only way to enter prior judgments"; the exhibits showed appellant's "unique name" and date of birth; and appellant's objections did not bar admission of the exhibits into evidence, but rather were matters to be weighed by the jury. The trial court overruled appellant's objections, and the exhibits were admitted into evidence for all purposes. After the exhibits were admitted, the State informed the jury that State's Exhibits 117 through 124 denoted convictions for possession of marijuana, aggravated assault with a deadly weapon, criminal trespass, resisting arrest, unlawful possession of a controlled substance, and two convictions for assault family violence against Deanna.

State's Exhibits 123 and 124 are records of assaults against Deanna committed by appellant. Each exhibit includes appellant's name and date of birth. The jury heard about the incidents reflected in State's Exhibits 123 and 124 during the guilt-innocence phase of the trial, through the testimony of Troy Smith and Joshua Smeltzer, the responding patrol officers, without objection. Also during Smeltzer's testimony, State's Exhibits 73 through 81, photographs relating to the assault, were admitted into evidence without objection. Exhibits 117, 118, 120, and 121 include appellant's name and date of birth.

We conclude that the trial court did not err by overruling appellant's objections to the admission of State's Exhibits 123 and 124. Jurors could have found beyond a reasonable doubt that appellant was the same person as the Delvecchio Patrick who committed the previous assaults

against Deanna. *See Alridge*, 732 S.W.2d at 396. As to the remaining challenged exhibits, even if the trial court's ruling was error, we conclude that it did not affect appellant's substantial rights. *See Garcia*, 126 S.W.3d at 927; TEX. R. APP. P. 44.2(b). Appellant was convicted of a first degree felony. The jury found that appellant had been previously convicted of the offense of aggravated assault on September 23, 1994, and the penitentiary packet relevant to that offense was admitted into evidence without objection. Under those circumstances, the range of punishment was "imprisonment for life, or for any term of not more than 99 years or less than 15 years." TEX. PENAL CODE ANN. § 12.42(c)(1) (West Supp. 2017). The jury assessed appellant's punishment at 85 years' imprisonment, within the range allowed by law and less than the permissible maximum. *See, e.g., Crain v. State*, 373 S.W.3d 811, 816 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (evidence of appellant's prior bad acts admitted during sentencing hearing did not have substantial and injurious effect on trial court's sentencing decision, given evidence of other extraneous offenses admitted without objection and sentence at low end of possible range). And as we have discussed, the evidence was sufficient to support appellant's conviction. We decide appellant's thirteenth issue against him.

## Conclusion

We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

180435F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

DELVECCHIO PATRICK, Appellant

No. 05-18-00435-CR V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1500259-V.
Opinion delivered by Justice Lang-Miers.
Justices Evans and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 20th day of August, 2018.